Human Rights Watch                    April 2004 Vol.16 No.4 (D)

# "Empty Promises:"
## Diplomatic Assurances No Safeguard against Torture

TABLE OF CASES ................................................................................................ 2

INTRODUCTION ............................................................................................... 3

DIPLOMATIC ASSURANCES AND THE UNITED NATIONS SYSTEM ............. 7

    U.N. Special Rapporteur on Torture ........................................................... 7

    U.N. Human Rights Committee ................................................................... 10

    U.N. Committee against Torture ................................................................. 12

    U.N. High Commissioner for Refugees ...................................................... 14

DIPLOMATIC ASSURANCES AND THEIR USE IN NORTH AMERICA ............. 15

    United States ............................................................................................. 15

        Federal Law ......................................................................................... 15

        The Case of Maher Arar ...................................................................... 16

    Canada ...................................................................................................... 18

        The Case of Manickavasagam Suresh ................................................. 18

        The Case of Rodolfo Pacificador ........................................................ 19

DIPLOMATIC ASSURANCES AND THEIR USE IN EUROPE ............................. 21

    Regional Law and Policy ........................................................................... 21

    Jurisprudence of the European Court of Human Rights (ECHR) ............... 23

        Chahal v. United Kingdom .................................................................. 23

        Shamayev and 12 Others v. Georgia and Russia ................................. 24

        Mamatkulov and Askarov v. Turkey .................................................... 26

    Examples of State Practice in the Council of Europe Region ..................... 29

        United Kingdom: The Case of Akhmed Zakaev ................................. 29

        Germany: The Case of Metin Kaplan ................................................. 31

        Austria: The Case of Mohamed Bilasi-Ashri ..................................... 32

        Sweden: The Cases of Ahmed Agiza and Mohammed al-Zari .......... 34

RECOMMENDATIONS ....................................................................................... 37

ACKNOWLEDGEMENTS .................................................................................... 39

# TABLE OF CASES

**Ahmed Agiza and Mohammed al-Zari (2001)**............................................33
Sweden to Egypt*

**Arar v. Ashcroft, et al. (2004)**............................................................16
United States to Syria

**Attia v. Sweden (2003)**....................................................................12
Sweden to Egypt

**Bilasi-Ashri v. Austria (2001)**..........................................................32
Austria to Egypt

**Canada v. Pacificador (2002)**...........................................................19
Canada to Philippines

**Chahal v. United Kingdom (1996)**....................................................23
United Kingdom to India

**In the matter of Metin Kaplan (2003)**.............................................31
Germany to Turkey

**Mamatkulov and Askarov v. Turkey (2003)**....................................26
Turkey to Uzbekistan

**Muhammed Solih (2001)**.................................................................27
Czech Republic to Uzbekistan

**Russia v. Zakaev (2003)**.................................................................29
United Kingdom to Russia

**Shamayev and 12 Others v. Georgia and Russia (2002)**...............24
Georgia to Russia

**Suresh v. Canada (2002)**................................................................18
Canada to Sri Lanka

*Under each case title is the sending country and the receiving or requesting country; for example, Sweden expelled Ahmed Agiza and Mohammed al-Zari to Egypt. In some cases, the sending country attempted to return a person based on diplomatic assurances, but a court prohibited the return, ruling that the assurances were not an adequate safeguard against torture; for example, the United Kingdom attempted to extradite Akhmed Zakaev to Russia.

# INTRODUCTION

Governments around the world have legitimate security concerns in the face of violent terrorist attacks. Some governments, however, are returning alleged terrorist or national security suspects to countries where they are at risk of torture or ill-treatment.[1] Governments have justified such acts by relying on diplomatic assurances—formal guarantees from the government in the country of return that a person will not be subjected to torture upon return.[2] States secure diplomatic assurances in advance of return and claim that by doing so, they comply with the absolute prohibition in international law against returning a person—no matter what his or her alleged crime or status—to a place where he or she would be at risk of torture or ill-treatment. Some states appear to be returning people based on diplomatic assurances with the knowledge that torture will be used upon return to extract information and confessions regarding terrorist activities and associations.[3] Governments sometimes also engage in post-return monitoring of persons they transfer, implying that such monitoring is an additional safeguard against torture.

The United Nations Security Council, however, requires that all measures to combat terrorism must conform with member states' international human rights obligations.[4] The absolute prohibition against torture, including the prohibition against returning a person to a place where he or she would be at risk of torture or ill-treatment, is a cornerstone of human rights protection.[5] There has long been consensus among states

---

[1] The word "return" includes any process leading to the involuntary return of a non-national either to his or her country of origin or to a third country, including by deportation, expulsion, extradition and rendition.

[2] Diplomatic assurances can also include guarantees against other forms of ill-treatment not rising to the level of torture, for a fair trial, or against application of the death penalty. While it is beyond the scope of this brief to discuss diplomatic assurances in the context of the death penalty, such assurances differ from the relatively novel practice of assurances against torture and ill-treatment in several respects. It is generally more straightforward to monitor a requesting state's compliance with assurances regarding the death penalty than with assurances against torture or ill-treatment as execution is a legal outcome, usually more immediately visible than torture or ill-treatment in detention, which by nature are illegal and practiced in secret. Thus, assurances against torture and ill-treatment should not be considered as a natural extension of the practice of securing assurances against execution. See section below on Canada for more on the distinction between the two.

[3] See, in particular, the section below on the United States.

[4] Security Council Resolution 1456 (2003) makes clear that: "States must ensure that any measure taken to combat terrorism complies with all their obligations under international law, and should adopt such measures in accordance with international law, in particular international human rights, refugee, and humanitarian law," para. 6 [online] http://ods-dds-ny.un.org/doc/UNDOC/GEN/N03/216/05/PDF/N0321605.pdf?OpenElement (retrieved March 31, 2004).

[5] The prohibition against torture and ill-treatment, including the prohibition against returning a person to a country where he or she is at risk of torture or ill-treatment, is absolute and permits no exceptions; states cannot derogate from this obligation. The prohibition is enshrined in articles 1 and 3 of the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT); article 7 of the International Covenant on Civil and Political Rights (ICCPR); article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR); article 5 of the American Convention on Human Rights (ACHR); and article 5 of the African Charter on Human and Peoples' Rights (Banjul Charter). The prohibition against torture has risen to the level of *jus cogens* and is a peremptory norm of international law. For the purposes of this paper, the word "torture" when used alone includes cruel, inhuman, or degrading treatment or punishment in conformity with the instruments noted above and the U.N. Human Rights Committee's General Comment No. 20 (1992), which states: "In the view of the Committee, States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to

that the prohibition against torture is among the rights so fundamental to the preservation of human dignity that there can be no justification for their violation, even in a climate of fear generated by acts of terrorism. This widespread commitment to respect for human life and the rule of law stands in stark contrast to the disdain for these principles shown by terrorists.

The widespread or systematic use of torture in many of the countries to which people have been returned, indicates that diplomatic assurances and post-return monitoring are inadequate safeguards against torture and ill-treatment. In the vast majority of cases, states seek diplomatic assurances from governments in countries where torture is systematic or routinely practiced upon certain types of people—political dissidents, for example. In countries where torture is widespread, systematic, or where particular types of people are routinely tortured based on their race, ethnicity, religion, political opinions or other status, torture is practiced in secret, within the walls of prisons and detention facilities rarely open to scrutiny by independent, well-trained monitors. Prison guards and other prison personnel are trained in torture techniques that ensure such secrecy, including physical abuse that leaves few outward marks and intimidation tactics that frighten prisoners into silence about the abuse. Prison doctors and other medical personnel are often complicit in covering up any signs of torture. In such countries, governments routinely deny lawyers and family members confidential access or private visits with prisoners. As noted above, they also deny access to independent monitors, expert in detecting signs of torture. In some countries, where torture is widespread and endemic, state authorities may not have effective control over the forces perpetrating acts of torture. Indeed, governmental authorities in countries where torture is systematic routinely deny the existence of torture at all.

The dangers of relying on diplomatic assurances as a safeguard against torture are apparent. Where governments routinely deny that torture is practiced, despite the fact that it is systematic or widespread, official assurances cannot be considered reliable. The secrecy surrounding the practice of torture militates against effective post-return monitoring.

Governments are aware of the dynamics of torture noted above. Indeed, post-return monitoring per definition implies a fundamental distrust of the formal diplomatic assurances and lack of confidence in domestic mechanisms to hold perpetrators of torture accountable in the countries offering such assurances. Sending governments would no doubt argue that post-return monitoring is merely a failsafe, and that they would not return anyone whom they genuinely believed to be at risk. But when governments and international organizations dispatch monitors to observe elections or assess human rights they do so because they fear election fraud and human rights violations. It follows that the use of post-return monitoring in cases of returns involving

---

another country by way of their extradition, expulsion or *refoulement*. States parties should indicate in their reports what measures they have adopted to that end." Though the language of *non-refoulement* is most commonly associated with the 1951 Convention relating to the Status of Refugees, the obligation of *non-refoulement* has much broader application vis-à-vis the CAT and other instruments referenced above, and thus applies to the return of any person at risk of torture or ill-treatment, not only refugees.

diplomatic assurances amounts to an acknowledgement that returnees are at risk of torture or ill-treatment.

Moreover, post-return monitoring of the sort required by the absolute prohibition against torture would necessarily involve constant vigilance from the date of return onward by persons expertly trained at detecting signs of torture and unfettered access without advance notice to prisons, police stations, and other places of detention. It would also require that monitors have the authority and political will to remedy the situation and seek accountability for the abusing government. Even if these conditions were attainable, any government undertaking such monitoring would gain nothing by acknowledging the receiving state's abuse other than its own admission of violating the norm against return.

Despite the problems associated with diplomatic assurances, some governments justify the practice of returns based on them as a requirement of their international obligations to combat terrorism. When Sweden made submissions to the U.N. Committee against Torture to explain its summary expulsion in December 2001 of two Egyptian asylum seekers suspected of terrorism-related acts, following diplomatic assurances of fair treatment from the Egyptian authorities, it invoked its responsibility under U.N. Security Council Resolution 1373 to "deny safe haven to those who finance, plan, support or commit terrorist acts, or themselves provide safe haven."[6] In a similar vein, after Georgia extradited five Chechens to Russia following Russian diplomatic assurances, despite a request from the European Court of Human Rights not to extradite, then-President Eduard Shevardnadze replied to criticism of the returns by stating that "International human rights commitments might become pale in comparison with the importance of the anti-terrorist campaign."[7]

Some U.N. human rights mechanisms have openly criticized the interpretation of Security Council Resolution 1373 relied on by Sweden, pointing to the subsequent Security Council Resolution 1456, which requires states to "ensure that any measure taken to combat terrorism complies with all their obligations under international law," and to "adopt such measures in accordance with international law, in particular international human rights, refugee, and humanitarian law."[8] In June 2003, Nigel Rodley, a member of the U.N. Human Rights Committee and former Special Rapporteur on Torture, appeared before the newly established Counter Terrorism Committee (CTC), the U.N. mechanism tasked with monitoring states' compliance with Resolution 1373, to remind the committee that Resolutions 1373 and 1456 must be taken together to ensure that Resolution 1373 did not become "an instrument for circumventing states' human

---

[6] See *Attia v. Sweden*, CAT/C/31/D/199/2002, November 24, 2003, para. 4.4 [online] http://www.unhchr.ch/tbs/doc.nsf/MasterFrameView/419f36fabc1ba168c1256df2002cb2f8?Opendocument (retrieved March 25, 2004).

[7] See International Helsinki Federation Appeal, "Violations of the Rights of Chechens in Georgia," December 23, 2002 [online] http://www.ihf-hr.org/viewbinary/viewhtml.php?doc_id=3500 (retrieved March 25, 2004).

[8] Security Council Resolution 1456 (2003), op. cit., para. 6.

rights obligations.'"[9] Significantly, Rodley expressed particular concern that in the course of reviewing Slovakia's first report, the CTC's follow-up questions, requesting clarification regarding expulsions and exclusion of persons from refugee status based on suspected links with terrorist groups,[10] "could be understood to be urging that State to overlook the principle that in no case should a person be sent to a territory where he or she faces torture or cruel, inhuman, or degrading treatment or punishment."[11] Rodley urged the CTC to pose questions to member states on the human rights dimensions of their reports to the Committee, as suggested in a 2002 memo issued by the U.N. High Commissioner for Human Rights to the CTC; and to seek human rights expertise "among the complement of expertise it [the CTC] has at its disposal."[12]

The use of diplomatic assurances is not well-documented and practice appears to vary among states, regions, and legal jurisdictions. Few jurisdictions expressly provide for the use of diplomatic assurances in law. Negotiations for securing diplomatic assurances are often conducted at a political level and are not transparent. In many countries, a person has no effective opportunity to challenge the reliability and adequacy of such assurances.

This report analyzes the use of diplomatic assurances by governments and commentary on their use from the U.N. system, North America, and the Council of Europe region. It includes Human Rights Watch's research on several cases that involve the use of diplomatic assurances. The report examines cases in which courts have ruled on the adequacy of such assurances, frequently finding that diplomatic assurances are not an effective safeguard against torture. The report highlights returns or proposed returns based on diplomatic assurances from Austria, Canada, Georgia, Germany, Sweden, Turkey, United Kingdom, and the United States to countries where torture is a serious or systematic human rights problem, including Egypt, Philippines, Russia, Sri Lanka, Syria, and Uzbekistan. This is not an exhaustive survey, but reflects relevant information available to Human Rights Watch indicating inherent problems and dangers with respect to the use of diplomatic assurances and how select legal systems have addressed the use of such assurances.

---

[9] Security Council Counter-Terrorism Committee, Briefing by Sir Nigel Rodley, Vice Chairperson, U.N. Human Rights Committee, "Human Rights and Counter-Terrorism Measures," June 19, 2003, para. 3 [online] http://www.unhchr.ch/huricane/huricane.nsf/0/EE1AC683F3B6385EC1256E4C00313DF5?opendocument (retrieved March 25, 2004).

[10] Supplementary report of Slovakia to the CTC, July 2, 2002, pages 15, 20-21 [online] http://ods-dds-ny.un.org/doc/UNDOC/GEN/N02/479/33/IMG/N0247933.pdf?OpenElement (retrieved March 25, 2004).

[11] Security Council Counter-Terrorism Committee, Briefing by Sir Nigel Rodley, op. cit., para. 11.

[12] Ibid., paras. 10 and 11. Rodley refers to the Office of the High Commissioner for Human Rights (OHCHR), "Note to the Chair of the Counter-Terrorism Committee: A Human Rights Perspective on Counter-Terrorist Measures," September 23, 2002 [online] http://www.un.org/Docs/sc/committees/1373/ohchr1.htm (retrieved March 25, 2004) and OHCHR, "Further Guidance Note on Compliance with International Human Rights Standards," September 23, 2002 [online] http://www.un.org/Docs/sc/committees/1373/ohchr2.htm (retrieved March 25, 2004).

## DIPLOMATIC ASSURANCES AND THE UNITED NATIONS SYSTEM

Several U.N. human rights mechanisms have commented on the use of diplomatic assurances in the context of member states' obligation not to return a person to a risk of torture or ill-treatment. These U.N. mechanisms have commented or deliberated on the circumstances in which diplomatic assurances can be used and what safeguards should be in place to ensure that, if used, they are effective in protecting the person in question from torture or ill-treatment upon return and throughout the duration of his or her stay in the country of return.

### U.N. Special Rapporteur on Torture

In his February 2002 annual report to the Commission on Human Rights, the first in the immediate aftermath of the September 11, 2001, terrorist attacks in the United States, the Special Rapporteur on Torture concluded that "the legal and moral basis for the prohibition against torture and other cruel, inhuman, or degrading treatment or punishment is absolute and imperative and must under no circumstances yield or be subordinated to other interests, policies, and practices."[13] The Special Rapporteur's July 2002 interim report to the General Assembly, specifically focusing on the prohibition of torture in the context of counter-terrorism measures, reaffirms the absolute nature of the prohibition, and calls on states not to extradite anyone "unless the Government of the receiving country has provided an unequivocal guarantee to the extraditing authorities that the persons concerned will not be subjected to torture or any other forms of ill-treatment upon return, and that a system to monitor the treatment of the persons in question has been put into place with a view to ensuring that they are treated with full respect for their human dignity."[14]

The Special Rapporteur emphasizes a two-pronged approach to gauging the reliability of diplomatic assurances. Before a person may be returned, assurances must be "unequivocal," that is, leaving absolutely no doubt that no torture or ill-treatment will occur. Second, there must be a "system to monitor" the protection of the returned person from torture and ill-treatment. Such a systematic program of rigorous and on-going monitoring is created by advance agreement between the two states involved and will ascertain that the objective conditions exist—and will continue to exist—for protection against mistreatment. Any effective post-return monitoring system requires

---

[13] Report of the Special Rapporteur on Torture, Theo van Boven, to the United Nations Commission on Human Rights, 58th Session, E/CN.4/2002/137, February 26, 2002, para. 15.

[14] Interim report of the Special Rapporteur on Torture, Theo van Boven, to the General Assembly A/57/173, July 2, 2002. The Special Rapporteur's July 2003 report to the General Assembly states that both the U.N Human Rights Committee and the Committee against Torture have also recently reaffirmed the absolute nature of the principle of *non-refoulement* "and that expulsion of those suspected of terrorism to other countries must be accompanied by an effective system to closely monitor their fate upon return, with a view to ensuring that they will be treated with respect for their human dignity." Report by the Special Rapporteur on Torture, Theo van Boven, to the United Nations General Assembly, A/58/120, July 3, 2003, para. 15.

the good faith and the requisite logistical capacity of both governments to provide a reliable safeguard against the risk of torture.[15]

The Special Rapporteur thus creates the highest of bars to reliance on diplomatic assurances in the context of returns where a person would be in danger of torture or ill-treatment. This raises the question of whether diplomatic assurances can ever be an effective safeguard for returns to countries where the practice of torture is systematic, widespread or endemic. Some states, however, have invoked the Special Rapporteur's statements on the issue of diplomatic assurances to justify returns to countries that practice systematic torture or where torture is endemic. Sweden, for example, in a memorandum to the Human Rights Committee in May 2003 regarding the expulsions of two asylum seekers to Egypt,[16] supported its claim that Egypt's assurances were an adequate safeguard against torture by citing the Special Rapporteur's July 2002 interim report and formula for diplomatic assurances,[17] despite well-documented evidence that torture in Egypt is, in fact, widespread.[18]

This interpretation, however, is not supported by the Special Rapporteur's subsequent report dealing with one such country where torture is a serious and persistent problem, Uzbekistan. The Special Rapporteur's February 2003 report, finding that torture or other similar ill-treatment is "systematic" in Uzbekistan, relies on the following definition, currently in use by the U.N. Committee against Torture:

> Torture is practised systematically when it is apparent that torture cases reported have not occurred fortuitously in a particular place or at a

---

[15] A recent experience of the Special Rapporteur himself would seem to illustrate the need for assurances made in good faith and the capacity to comply with those assurances. In his February 2003 report on the question of torture in Uzbekistan, the Special Rapporteur details his "aborted visit to Jaslyk [penal] colony." Despite indicating to the Uzbek authorities, upon whose invitation van Boven was in the country, that he required six hours to evaluate conditions in Jaslyk, "often cited for its hardship conditions and inhuman practices," the itinerary and plane scheduled for the Special Rapporteur and arranged by the Uzbek authorities left van Boven only two hours for his assessment. The Special Rapporteur thus refused to inspect the colony and instead discussed deaths in custody with its director and conducted a few confidential interviews with inmates. However, the Special Rapporteur "noted with concern that these confidential interviews were abruptly disrupted on several occasions by the government official accompanying the Special Rapporteur's delegation." The Special Rapporteur regretted that he was unable to carry out his visit to Jaslyk "in a satisfactory and comprehensive manner." See Report of the Special Rapporteur on Torture, Mission to Uzbekistan, E/CN.4/2003/68/add.2, February 3, 2003, para. 49 [online] http://www.unhchr.ch/Huridocda/Huridoca.nsf/0/29d0f1eaf87cf3eac1256ce9005a0170/$FILE/G0310766.doc (retrieved March 31, 2004). The Special Rapporteur concluded by regretting that the mission's terms of reference (presumably agreed in advance) were not fully respected. Ibid., para. 60.

[16] Op. cit., footnote 6. See also section below on Sweden.

[17] Submission of the Swedish government to the U.N. Human Rights Committee ("Information requested by the Human Rights Committee from the Government of Sweden), May 6, 2003, on file with Human Rights Watch.

[18] In December 2002, the U.N. Committee against Torture expressed concerns regarding "the many consistent reports received concerning the persistence of the phenomenon of torture and ill-treatment of detainees by law enforcement officials [in Egypt]," "widespread evidence of torture and ill-treatment in administrative premises under the control of the State Security Investigation Department," and "the fact that victims of torture and ill-treatment have no direct access to the courts to lodge complaints against law enforcement officials." See Conclusions and Recommendations of the Committee against Torture on the Fourth Periodic Report of Egypt, CAT/C/CR/29/4, December 23, 2002 [online] http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/CAT.C.CR.29.4.En?Opendocument (retrieved March 31, 2004).

particular time, but are seen to be habitual, widespread and deliberate in at least a considerable part of the territory of the country in question. Torture may in fact be of a systematic character without resulting from the direct intention of a Government. It may be the consequence of factors which the Government has difficulty in controlling, and its existence may indicate a discrepancy between policy as determined by the central Government and its implementation by the local administration. Inadequate legislation which in practice allows room for the use of torture may also add to the systematic nature of this practice.[19]

This definition of "systematic" appears to preclude reliance on diplomatic assurances from countries where torture is systematic. The definition allows for two possibilities: 1) torture is state policy, and its practice is intended and sanctioned at the highest levels of government; 2) torture is practiced, but governmental authorities do not have effective control over the forces at local level that perpetrate acts of torture. In both cases, reliance on diplomatic assurances could not provide the guarantees necessary to meet the returning state's international obligations.

States where recourse to torture is a matter of state policy routinely deny the practice, often despite well-documented evidence that torture is, in fact, systematic. Assurances from such a state that a particular person would not be subject to torture if extradited or otherwise returned cannot therefore be considered as offered in good faith. For example, in his report on Uzbekistan, which illustrates the practice of systematic torture there with cases going back to 1992, the Special Rapporteur on Torture concludes that denials by Uzbek authorities that torture is systematic and sanctioned at the highest levels of authority are disingenuous:

> ...the Special Rapporteur has no doubt that the system of torture is condoned, if not encouraged, at the level of the heads of the places of detention where it takes place...If the top leadership of these forces and those politically responsible above them do not know of the existence of a system which the Special Rapporteur's delegation was able to discover in a few days, it can only be because of a lack of desire to know. Moreover, in light of the information repeatedly conveyed to the authorities by the Special Rapporteur himself, [U.N.] human rights monitoring bodies,...and NGOs, the lack of such awareness may well reflect an unwillingness to look too closely at the problem. The very hierarchical nature of the law enforcement bodies also makes it difficult

---

[19] Report of the Special Rapporteur on Torture, Mission to Uzbekistan, February 2003, op. cit., para. 68.

to believe that the top leadership of these forces is not aware of the situation...[20]

The Special Rapporteur's findings indicate that diplomatic assurances from any government that persistently denies systematic torture or fails to take measures to halt the practice cannot be deemed reliable, and thus cannot comprise an adequate safeguard against torture and ill-treatment.

In order to ensure that the Special Rapporteur's words are not misused to justify human rights violations, it is imperative that the Special Rapporteur reaffirm the absolute nature of the prohibition against returning a person to a risk of torture, and elaborate on the phenomenon of reliance on diplomatic assurances in a manner fully consistent with that absolute prohibition.[21]

### U.N. Human Rights Committee

The U.N. Human Rights Committee has noted that the obligation not to return a person to a place where he or she would be at risk of torture is inherent in International Covenant on Civil and Political Rights (ICCPR) article 7. In its General Comment 20 (1992) on article 7, the committee said: "In the view of the Committee, States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion, or refoulement."[22]

The Committee has also considered the link between the return of non-nationals and the prohibition against torture in its conclusions and recommendations on individual country reports, questioning the adequacy of such assurances as an effective safeguard. In its response to the Swedish government for expelling the two Egyptian asylum seekers in December 2001, the Committee expressed doubts about whether the

---

[20] Ibid., para. 69.

[21] In his presentation to the CTC noted above, Rodley reaffirmed the absolute prohibition against returns to risk of torture, but also said: "Let me at once point out that this alleged safeguard will not in fact be subjected to the feared violation. But those measures would need to be serious and effective." Security Council Counter-Terrorism Committee, Briefing by Sir Nigel Rodley, op. cit., para. 12. Assuming that this is a reference to securing diplomatic assurances, such a formulation for this alleged safeguard to torture is extremely vague—and thus open to various interpretations. The prohibition against torture is absolute and permits no exceptions. As such, any proposed safeguards must be fully articulated to ensure unequivocally that no violation will occur.

[22] General Comment No. 20 (1992), op. cit., para. 9. Moreover, in March 2004, the Human Rights Committee adopted General Comment No. 31 on ICCPR article 2 regarding "The Nature of the General Legal Obligation Imposed on States Parties to the Covenant." Paragraph 12 reads: ". . . the article 2 obligation requiring that States Parties respect and ensure the Covenant rights for all persons in their territory and all persons under their control entails an obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm, such as that contemplated by articles 6 and 7 of the Covenant, either in the country to which removal is to be effected or in any country to which the person may subsequently be removed. The relevant judicial and administrative authorities should be made aware of the need to ensure compliance with the Covenant obligations in such matters," General Comment No. 31, CCPR/C/74/CRP.4/Rev.5, March 29, 2004.

assurances were adequate and whether Sweden had ensured there were "credible mechanisms" to monitor the men's treatment post-return:

> The Committee is concerned at cases of expulsion of asylum-seekers suspected of terrorism to their countries of origin. Despite guarantees that their human rights would be respected, those countries could pose risks to the personal safety and lives of the persons expelled, especially in the absence of sufficiently serious efforts to monitor the implementation of those guarantees (two visits by the embassy in three months, the first only some five weeks after the return and under the supervision of the detaining authorities). . .The State party should maintain its practice and tradition of observance of the principle of non-refoulement. When a State party expels a person to another State on the basis of assurances as to that person's treatment by the receiving State, it must institute credible mechanisms for ensuring compliance by the receiving State with these assurances from the moment of expulsion.[23]

Thus, the Human Rights Committee echoes the Special Rapporteur on Torture's reaffirmation of the absolute nature of the prohibition against sending a person to a country where he or she would be at risk of torture. Moreover, the Committee's reference to credible monitoring mechanisms from the date of expulsion highlights the inherent difficulties in developing post-return monitoring mechanisms that are adequate and effective, in order both to ensure that no violations occur and to hold abusive governments accountable if they do. If a person is tortured or ill-treated upon return, both governments should be held accountable, since both will have violated the prohibition against torture.

Likewise, in its 2002 conclusions on the report of New Zealand, the Committee expressed doubts about reliance on diplomatic assurances and recommended that the state party "strictly" observe its international obligations: "The Committee recognizes that the security requirements relating to the events of 11 September 2001 have given rise to efforts by New Zealand to take legislative and other measures to implement Security Council resolution 1373…The Committee…expresses its concern that the

---

[23] Human Rights Committee, Concluding Observations on the Fifth Periodic Report of Sweden, CCPR/C/74/SWE, April 24, 2002, para. 12. The failure of the Swedish government to effect any monitoring within the first five weeks of return is particularly disturbing. The International Committee of the Red Cross (ICRC), U.N., and other intergovernmental, nongovernmental, and humanitarian organizations, have concluded that detainees are most at risk for torture and ill-treatment within the first forty-eight hours of custody. See Human Rights Watch, "The Legal Prohibition against Torture" *A Human Rights Watch Q and A*  March 2003 [online] http://www.hrw.org/press/2001/11/TortureQandA.htm (retrieved March 25, 2004). The Committee took the extraordinary step of requiring Sweden to report back to it in one year, instead of the standard five, regarding the steps the government took to ensure Egyptian compliance with the assurances and to offer evidence that the men were in fact not subject to treatment contrary to ICCPR article 7. The special session, held in July-August 2003, was closed. No public statements were issued by the Committee, but its annual report to the General Assembly made clear that it was not fully satisfied with the Swedish government's response and that the Committee had decided to pursue certain outstanding issues with respect to the cases. See Report of the Human Rights Committee to the General Assembly, A/58/40(Vol. I), November 1, 2003.

impact of such measures or changes in policy on New Zealand's obligations under the Covenant may not have been fully considered. The Committee is concerned about possible negative effects of the new legislation [and] the absence of monitoring mechanisms with regard to the expulsion of those suspected of terrorism to their countries of origin which, despite assurances that their human rights would be respected, could pose risks to the personal safety and lives of the persons expelled."[24] The Committee concluded that New Zealand should maintain its practice of "strictly observing the principle of non-refoulement."[25]

### *U.N. Committee against Torture*

The U.N. Convention against Torture, and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) explicitly prohibits the return of a person to a country where he or she would be in danger of torture.[26] In *Tapia Paez v. Sweden*, the Committee against Torture, authorized under the CAT to consider individual cases, stated that the test of article 3 of the Convention is absolute: "Whenever substantial grounds exist for believing that an individual would be in danger of being subjected to torture upon expulsion to another State, the State party is under obligation not to return the person concerned to that State. The nature of the activities in which the person concerned engaged cannot be a material consideration when making a determination under article 3 of the Convention."[27]

In the November 2003 case of Hanan Attia,[28] however, the Committee gave substantial deference to diplomatic assurances against torture, in particular where the suppression of international terrorism was at issue. This approach diverges from the other U.N. human rights mechanisms mentioned above and unfortunately threatens to undermine the principle that human rights obligations must be observed in all measures taken in the international effort to combat terrorism.

Hanan Attia, the wife of Ahmed Agiza, one of the Egyptians returned to Egypt by the Swedish government in December 2001, appealed her own pending return to the Committee against Torture. Her claim was based on the fact that the Egyptian government was preparing to try her husband on terrorism-related charges, and was likely to detain and torture her in an attempt to gain information about him. She also

---

[24] Human Rights Committee, Concluding Observations on the Fourth Periodic Report of New Zealand, CCPR/CO/75/NZL, August 7, 2002, para. 11.

[25] Ibid.

[26] CAT article 3 states: "No party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

[27] *Tapia Paez v. Sweden*, Communication No. 39/1996, April 28, 1997.

[28] See *Attia v. Sweden*, CAT/C/31/D/199/2002, November 24, 2003 [online] http://www.unhchr.ch/tbs/doc.nsf/MasterFrameView/419f36fabc1ba168c1256df2002cb2f8?Opendocument (retrieved March 25, 2004).

presented information from family members and a Swedish journalist to the effect that her husband had been tortured and mistreated in prison, contrary to diplomatic assurances given to the Swedish government by the Egyptian authorities, and contrary to the impressions of Swedish diplomatic personnel who had interviewed him during visits. As described in more detail below (see section on Sweden), none of the visits made by Swedish diplomatic representatives to Agiza were held in private. Prison personnel, including the warden and guards, were always present.

The Committee's November 2003 decision that there was no violation of CAT article 3 in Hanan Attia's case relied heavily on visits by Swedish diplomatic representatives to Agiza, beginning nearly two years before it considered his wife's case; the fact that there had also been regular family visits in prison with Agiza; the alleged high level of the unnamed Egyptian official who presented assurances to Sweden; and the way in which the Swedish government impressed upon the Egyptian authorities that its conduct in this case would set a precedent for European cooperation with Egypt. The CAT decision also stated that Attia's case was based solely on her relationship with her husband, rejecting her claim based on the conclusion that Agiza's treatment in prison in Egypt was reported to be adequate.

There are many aspects of this decision that are troubling from a human rights perspective. The lack of privacy with the detainee during visits by Swedish representatives does not comport with the standards for prison visits to assess torture and ill-treatment applied by the International Committee of the Red Cross, nongovernmental organizations expert in prison issues, and the Special Rapporteur on Torture.[29] This fact, combined with the contrary accounts of relatives and a journalist who visited Agiza—supported by evidence provided by Amnesty International and other human rights organizations—raises serious questions about the reliability of the conclusions of Swedish representatives regarding Agiza's treatment. Given that the greatest risk of torture is generally in initial periods of detention, it is very troubling that five weeks elapsed before Agiza was first visited by Swedish officials. The Committee in the Attia decision never addresses such inconsistencies and lapses.

The Committee also failed to consider that unlike her husband, Attia—not pursued by the Egyptian authorities on suspicion of any criminal activity—would not be handed directly to authorities of the state, making monitoring of her whereabouts and condition more problematic. Moreover, the Swedish government's emphasis on its obligations to combat terrorism under Security Council Resolution 1373 allows an inappropriate inference that Agiza's alleged actions had some bearing on whether Attia's return is warranted. Finally, there was a disturbing lack of transparency, as the Committee granted Sweden's numerous requests to omit selected evidence from the record of the

---

[29] See U.N. Special Rapporteur on Torture, General Recommendations, E/CN.4/2003/68, para. (f) regarding prison monitoring and private visits [online] http://www.unhchr.ch/html/menu2/7/b/torture/recommendations.doc (retrieved March 24, 2004); and International Committee of the Red Cross, "How Visits by the ICRC can Help Prisoners Cope with the Effects of Traumatic Stress," Section on Private and Confidential Interviews with Prisoners, January 1, 1996 [online]
http://www.icrc.org/web/eng/siteeng0.nsf/iwpList302/219CF73383F594D2C1256B660059956E (retrieved March 24, 2004).

proceedings, including on the issue of allegations of torture and ill-treatment by Agiza and the Swedish government's response to such allegations.[30]

The fact that Egypt did not seek Attia's extradition nor lay criminal charges against her seems to have led the Committee to conclude she was at less risk than her husband, though in actual fact a potential witness may also be at great risk. The *Attia* decision also relies on Egypt's status as a state party to the Convention against Torture in its conclusion that Attia would not be at risk of torture upon return, implying that mere accession to U.N. human rights instruments guarantees compliance with the obligations enshrined therein.

Despite these weaknesses, the *Attia* decision essentially underscores some key elements of other U.N. treaty body jurisprudence pertaining to the prohibition against returning a person at risk of torture. The requirement of good faith behind the assurances is acknowledged, even though it is assumed to have been met in this case because of the high political level of negotiations and access to the prisoner granted to Swedish officials. The requirement of monitoring is also present, although again it is assumed to have been met, (despite unchallenged evidence that the monitoring visits were not held in private and were not confidential).

## U.N. High Commissioner for Refugees

It is beyond the scope of this paper to consider the relationship between asylum and extradition. Recent research commissioned by the United Nations High Commissioner for Refugees (UNHCR), however, echoes the concern that diplomatic assurances are an inadequate safeguard for returns to countries where torture is a serious problem:

> Assurances by the requesting State that it will not expose the person concerned to torture, or to inhuman or degrading treatment or punishment, will not normally suffice to exonerate the requested state from its human rights obligations, particularly where there is a pattern of such abuses in the State seeking extradition. In such cases, the requested State is bound to refuse the surrender of the wanted person.[31]

This conclusion further reinforces the principle that the only absolute protection against irreparable and prohibited harm upon return, is not to return a person if there is any doubt at all that he or she would be at risk of torture or ill-treatment.

---

[30] *Attia v. Sweden*, op. cit., paras. 4.5, 4.7, 4.14., and 9.4.

[31] Sibylle Kapferer, *The Interface between Extradition and Asylum*, Legal and Protection Policy Research Series, Department of International Protection, United Nations High Commissioner for Refugees, PPLA/2203/05, November 2003, para. 137 [online] http://www.unhcr.ch/cgi-bin/texis/vtx/home/+swwBmeRKn9CwwwwnwwwwwwwhFqA72ZR0gRfZNtFqrpGdBnqBAFqA72ZR0gRfZNcFq 35oxOccnaAwphnGnGDzmxwwwwwww/opendoc.pdf (retrieved March 31, 2004). This study is currently under consideration by UNHCR.

## DIPLOMATIC ASSURANCES AND THEIR USE IN NORTH AMERICA

### *United States*

### *Federal Law*

The United States is one of the few legal systems that provides in law for the use of diplomatic assurances in the context of its obligations under the Convention against Torture (CAT). According to a federal regulation, 8 C.F.R. § 208.18(c), the Secretary of State may secure assurances from a government that a person subject to return would not be tortured. In consultation with the Attorney General, the Secretary of State will determine whether the assurances are "sufficiently reliable" to allow the return in compliance with CAT. Once assurances are approved, any claims a person has under the CAT will not be given further consideration by U.S. authorities.[32]

According to a February 1999 commentary by the U.S. Department of Justice, the nature, reliability, and verification of assurances would require "careful evaluation" before an alien's removal.[33] The determination to use diplomatic assurances is decided on a case-by-case basis, and may relate to the risk of torture or aspects of the requesting State's criminal justice system that protect against mistreatment, for example access to counsel.[34] The Secretary of State considers "the identity, position, or other information concerning the official relaying the assurances, and political or legal developments in the requesting State that would provide context for the assurances provided."[35] The State Department may also consider the diplomatic relations between the United States and the requesting country.[36]

When constructing diplomatic assurances, the State Department may require a monitoring or review mechanism to ensure compliance with the assurances. For instance, the State Department can ask human rights groups to monitor the condition of

---

[32] 8 C.F.R. § 208.18(c) - Diplomatic assurances against torture obtained by the Secretary of State. (1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country. (2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention against Torture...(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

[33] Regulations Concerning the Convention against Torture, 64 FR 8478, 8484, February 19, 1999.

[34] Written Declaration by Samuel M. Witten, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser of the U.S. Department of State, *Cornejo-Barreto v. Seifert*, United States District Court for the Central District of California Southern Division, Case No. 01-cv-662-AHS, October 2001, para. 8 [online] http://www.state.gov/documents/organization/16513.pdf (retrieved March 24, 2004).

[35] Ibid., para. 9.

[36] Ibid.

those extradited under a diplomatic arrangement.[37] The decision to implement a monitoring or review mechanism is also determined on a case-by-case basis. The factors considered include "the identity of the requesting State, the nationality of the fugitive, the groups or persons that might be available to monitor the fugitive's condition, the ability of such groups or persons to provide effective monitoring, and similar considerations."[38]

The deficits in the U.S. law lie in the discretionary nature of measures to verify the reliability of diplomatic assurances. There are no procedural guarantees for the returnee at all, including any opportunity to challenge the credibility or reliability of diplomatic assurances before an independent judicial body. Nor is there a requirement of a post-return monitoring mechanism or any guarantee that should there be such monitoring, it would be conducted by U.S. diplomatic or other officials following accepted practices of confidentiality.[39] There is also no clear requirement that the Secretary of State take into account the existence in the requesting state of a consistent pattern of gross, flagrant, or mass violations of human rights in conformity with the Convention against Torture article 3(2).

## The Case of Maher Arar

The circumstances surrounding the case of Maher Arar raise serious concerns about U.S. practice with respect to reliance on diplomatic assurances as a safeguard against CAT violations. In September 2002, the U.S. government apprehended Arar, a dual Canadian-Syrian national, in transit from Tunisia through New York to Canada, where he has lived for many years. After holding him for nearly two weeks, U.S. immigration authorities flew him to Jordan, where he was driven across the border and handed over to Syrian authorities, despite his repeated statements to U.S. officials that he would be tortured in Syria and his repeated requests to be sent home to Canada. Prior to his transfer, the U.S. government obtained assurances from the Syrian government that Arar would not be subjected to torture.

Arar was released without charge from Syrian custody ten months later and has alleged that he was in fact tortured repeatedly, often with cables and electrical cords, during his confinement in a Syrian prison.[40] The U.S. government has not explained why it sent him to Syria rather than to Canada, where he resides; why it believed Syrian assurances to be credible in light of the government's well-documented record of torture, including

---

[37] Ibid. para. 10.

[38] Ibid.

[39] The government includes other groups, including human rights organizations, as possible post-return monitors. The acknowledgement of the independent nongovernmental sector and its inclusion is welcome. However, it cannot serve as a substitute for active and on-going involvement of the state that surrenders a person to a country based on diplomatic assurances. Many human rights groups are marginalized by governments in states that practice torture. Notwithstanding the inherent problems with post-return monitoring noted above, responsibility for securing access to governmental authorities and holding them accountable for compliance with diplomatic assurances must rest primarily with the surrendering government.

[40] Maher Arar's complete statement to media, CanWest News Service, November 4, 2003.

designation as a country that practices systematic torture by the U.S. Department of State's 2003 Country Reports on Human Rights Practices;[41] and why, in this case, it deemed that no post-return monitoring plan was required as a condition of return.[42]

On January 22, 2004, Maher Arar filed suit in U.S. Federal Court alleging violations of the Torture Victim Protection Act.[43] The U.S. Department of Homeland Security Inspector General has initiated a review of the Arar case.[44] The Canadian government will also hold a full public inquiry.[45]

The Arar case reinforces Human Rights Watch's concern that diplomatic assurances may be used to return persons suspected of having information about terrorism-related activities to countries where torture is routinely used, specifically to extract such information.[46] This concern is bolstered by the comments of former U.S. intelligence officials and sources within the U.S. administration who have stated publicly that they believe some transferred suspects are being tortured.[47]

---

[41] "Spokesmen at the Justice Department and the CIA declined to comment on why they believed the Syrian assurances to be credible." Dana Priest, "Man was Deported after Syrian Assurances," *Washington Post*, November 20, 2003, page A24. See also United States Department of State Country Reports on Human Rights Practices for 2002: Syria, published in March 2003 [online] http://www.state.gov/g/drl/rls/hrrpt/2002/18289.htm (retrieved March 26, 2004).

[42] According to press reports, Imad Moustafa, the charge d'affaires at the Syrian Embassy in Washington, denied Arar was tortured. Dana Priest, "Top Justice Aid Approved Sending Suspect to Syria," Washington Post, November 19, 2003, page A28. Priest quotes Moustafa as saying, "... Syria had no reason to imprison Arar. He said U.S. intelligence officials told their Syrian counterparts that Arar was an al-Qaeda member. Syria agreed to take him as a favor and to win goodwill of the United States, he said." Ibid.

[43] The full text of the Arar complaint can be found [online] http://www.ccr-ny.org/v2/legal/september_11th/docs/ArarComplaint.pdf (retrieved March 26, 2004).

[44] Letter from Clark Kent Ervin, DHS Inspector General, to Hon. John Conyers, January 9, 2004, on file with Human Rights Watch.

[45] The terms of reference of the inquiry, issued in February 2004, can be found [online] http://www.psepc-sppcc.gc.ca/publications/news/20040205_e.asp (retrieved March 26, 2004).

[46] Gar Pardy, one of Canada's most senior diplomats at the time, stated that "The fact that you went looking for assurances, which is reflected here, tells you that even in the minds of the people who made this decision...I mean, there were some second thoughts." 60 Minutes II, "His Year in Hell," January 21, 2004 [online] http://www.cbsnews.com/stories/2004/01/21/60II/main594974.shtml (retrieved March 26, 2004).

[47] See Human Rights Watch, "United States: Alleged Transfer of Maher Arar to Syria, Letter to Department of Defense General Counsel Haynes Co-Signed by Amnesty International, The Center for Victims of Torture, International Human Rights Law Group, Lawyers Committee for Human Rights, Minnesota Advocates for Human Rights, Physicians for Human Rights, and RFK Memorial Center for Human Rights" *A Human Rights Watch Letter*, November 17, 2003 [online] http://www.hrw.org/press/2003/11/us-ltr111703.htm (retrieved March 26, 2004).

## Canada

### The Case of Manickavasagam Suresh

The inability of a person subject to involuntary return to challenge diplomatic assurances prior to return was addressed by Canada in a January 2002 decision. In Suresh v. Canada,[48] the Canadian Supreme Court expressed reservations about the reliability of diplomatic assurances as an adequate safeguard to the prohibition against torture, particularly in cases where a person is threatened with return to a country where torture is systematic. The court held that Manickavasagam Suresh, a Sri Lankan national subject to deportation on national security grounds, made a prima facie case in his first deportation hearing showing a substantial risk of torture if returned to Sri Lanka. Suresh was granted a new deportation hearing after the court concluded that his original hearing did not provide the procedural safeguards necessary to protect his right not to be deported to a place where he was at risk of torture, including the opportunity to challenge the validity of diplomatic assurances.[49]

With respect to the use of diplomatic assurances, the court stated that "Where the Minister is relying on written assurances from a foreign government that a person would not be tortured, the refugee must be given an opportunity to present evidence and make submissions as to the value of such assurances."[50] Moreover, the court distinguished the use of assurances in cases where there is a risk of torture from assurances given where a person subject to return may face the death penalty. The court articulated the operational problems inherent in relying on assurances in torture risk cases:

> A distinction may be drawn between assurances given by a state that it will not apply the death penalty (through a legal process) and assurances by a state that it will not resort to torture (an illegal process). We would signal the difficulty in relying too heavily on assurances by a state that it will refrain from torture in the future when it has engaged in illegal torture or allowed others to do so on its territory in the past. This difficulty becomes acute in cases where torture is inflicted not only with the collusion but through the impotence of the state in controlling the behaviour of its officials. Hence the need to distinguish between

---

[48] *Manickavasagam Suresh v. The Minister of Citizenship and Immigration and the Attorney General of Canada (Suresh v. Canada),* 2002, SCC 1. File No. 27790, January 11, 2002 [online] http://www.lexum.umontreal.ca/csc-scc/en/pub/2002/vol1/html/2002scr1_0003.html (retrieved March 26, 2004).

[49] The court noted that, at the time the case was decided, under section 53(1)(b) of Canada's Immigration Act regarding the review of decisions based on national security grounds and return to risk of torture, "there is no provision for a hearing, no requirement of written or oral reasons, no right of appeal—no procedures at all, in fact." Ibid., para. 117. The court determined that the U.N. Convention against Torture's explicit prohibition against deportation where there are "substantial grounds" for believing a person would be in danger of torture gave rise to a duty to provide procedural safeguards in national security cases where a person would be at risk of torture if returned: "Given Canada's commitment to the CAT, we find that ... the phrase "substantial grounds" raises a duty to afford an opportunity to demonstrate and defend those grounds." Ibid., para. 119.

[50] Ibid., para. 123.

> assurances regarding the death penalty and assurances regarding torture.
> The former are easier to monitor and generally more reliable than the
> latter.[51]

The court added guidelines for the assessment of the adequacy of assurances, including an evaluation of the human rights record of the government offering the assurances, the government's record in complying with its assurances, and the capacity of the government to fulfill the assurances, particularly where there is doubt about the government's ability to control its security forces.[52] The court's decision, however, upholds the principle that diplomatic assurances should not be relied upon when they are proffered by a state that practices torture or a state that does not have control over forces that perpetrate acts of torture.

### The Case of Rodolfo Pacificador

In a subsequent case that does not explicitly refer to *Suresh*, the Court of Appeal for Ontario quashed the extradition order ("warrant of surrender") of Rodolfo Pacificador, suspected of the murder of a former provincial governor in the Philippines in 1986, and held that Philippine assurances of fair treatment were not reliable. In *Canada v. Pacificador*,[53] decided in August 2002, the Court of Appeal held that the Philippines' "criminal procedures have been interpreted and applied in this very prosecution in a manner that 'sufficiently shocks the conscience' that to surrender the appellant would violate his section 7 [Canadian Charter of Rights and Freedoms] right not to be denied life, liberty, and security of the person except in accordance with the principles of fundamental justice."[54]

While the decision not to surrender Pacificador is based, in the main, on fair trial concerns, including excessive delay and lengthy pre-trial detention, the presiding judge stated that "it is important to view this record as a whole,"[55] and included consideration of evidence that Pacificador's co-defendant had been tortured in detention in the Philippines.[56] Evidence of the co-accused's torture included subjection to electric shock and mock execution;[57] evidence not contradicted by the Canadian government.[58]

---

[51] Ibid., para. 124.

[52] Ibid., para. 125.

[53] *Minister of Justice for Canada v. Rodolfo Pacificador (Canada v. Pacificador)*, Court of Appeal for Ontario, No. C32995, August 1, 2002.

[54] Ibid., para. 56. The Supreme Court of Canada has ruled that a Minister's surrender decision violates the Canadian Charter of Rights and Freedoms where the person subject to surrender would face a situation that is "simply unacceptable" or where the nature of the requesting country's criminal procedures or penalties "sufficiently shocks the conscience." *United States of America v. Allard and Charette*, 33 CCC (3d) 501 SCC, 1987; *R. v. Schmidt*, 333 CCC (3d) 193 SCC, 1987.

[55] Ibid., para. 53.

[56] Ibid.

[57] Ibid. para. 15.

The court stated in Pacificador: "The appellant makes serious allegations of political manipulation and fabrication of evidence, as well as allegations of appalling treatment of his co-accused during the lengthy pre-trial detention. No evidence has been led to dispute those allegations. At the very least, they establish a significant risk that the appellant will not be fairly treated upon his surrender."[59] The court concluded that the Philippines' authorities "failed to explain why the appellant's treatment on surrender will differ from that of his co-accused" and thus the assurances of fair treatment "failed to provide an adequate assurance that the delay and pre-trial detention of the appellant's co-accused would not be inflicted on the appellant as well."[60]

With respect to the Minister of Justice's reliance on Philippine assurances of fair trial and fair treatment, the court in Pacificador held that "when one looks at the record as a whole, the failure of the Philippines to provide acceptable explanations of what has gone on in the past or to provide adequate assurances about what might happen in the future, seriously undermines this fundamental element of the Minister's decision."[61]

---

[58] Ibid., para. 14.

[59] Ibid. para. 53.

[60] Ibid., para. 51.

[61] Ibid. para. 54. In February 2003, the Supreme Court of Canada dismissed the government's appeal in the *Pacificador* case.

## DIPLOMATIC ASSURANCES AND THEIR USE IN EUROPE

The absence of any provision in regional law for the use of diplomatic assurances as a safeguard to European governments' obligation not to return a person at risk of torture, and the existing jurisprudence of the European Court of Human Rights with respect to their use, distinguishes the European regional system from policy and practice within the United Nations treaty monitoring system and in North American jurisdictions.

### *Regional Law and Policy*

No European legal instrument expressly provides for reliance on diplomatic assurances as a safeguard against torture or ill-treatment in the context of extradition, deportation, or expulsion. For example, the European Convention on Extradition provides for the use of assurances, but only with respect to the death penalty.[62] The same Convention's Second Additional Protocol provides for the use of assurances to guarantee that a person who has been sentenced or subject to a detention order *in absentia* will have the right to a retrial in conformity with fair trial standards upon return.[63]

In January 2004, the European Arrest Warrant came into force in eight of the fifteen European Union member states.[64] The warrant applies to surrenders among E.U. member states only. The preamble to the E.U. framework decision adopting the warrant reaffirms the absolute nature of the prohibitions against the death penalty, torture, and returns to torture or ill-treatment.[65] The decision explicitly provides for the use of assurances only with respect to the opportunity of a retrial in cases of judgements or orders handed down *in absentia*, and for the review of life-sentences.[66]

---

[62] Article 11: Capital Punishment states that: "If the offence for which extradition is requested is punishable by death under the law of the requesting Party, and if in respect of such offence the death-penalty is not provided for by the law of the requested Party or is not normally carried out, extradition may be refused unless the requesting Party gives such assurance as the requested Party considers sufficient that the death-penalty will not be carried out." European Convention on Extradition (1957) [online] http://conventions.coe.int/Treaty/en/Treaties/Html/024.htm (retrieved March 26, 2004).

[63] Article 3 states that: "When a Contracting Party requests from another Contracting Party the extradition of a person for the purpose of carrying out a sentence or detention order imposed by a decision rendered against him *in absentia*, the requested Party may refuse to extradite for this purpose if, in its opinion, the proceedings leading to the judgment did not satisfy the minimum rights of defence recognised as due to everyone charged with criminal offence. However, extradition shall be granted if the requesting Party gives an assurance considered sufficient to guarantee to the person claimed the right to a retrial which safeguards the rights of defence." Second Additional Protocol to the European Convention on Extradition (1978) [online] http://conventions.coe.int/Treaty/en/Treaties/Html/098.htm (retrieved March 26, 2004).

[64] The European Arrest Warrant (EAW) is intended eventually to replace the European Convention on Extradition and the extradition provisions of the European Convention on the Suppression of Terrorism in all the E.U. member states. On January 1, 2004, the EAW came into force in Belgium, Denmark, Finland, Ireland, Portugal, Spain, Sweden, and the U.K. See Council Framework Decision on a European Arrest Warrant, 2002/584/JHA, June 13, 2002.

[65] "No person should be removed, expelled or extradited to a State where there is a serious risk that he or she would be subjected to the death penalty, torture or other inhuman or degrading treatment or punishment." Ibid., preamble, para 13.

[66] Ibid., article 5.

Likewise, the Protocol amending the European Convention on the Suppression of Terrorism, opened for signature on May 15, 2003, includes a provision obliging Contracting States to seek assurances only if a person concerned risks being exposed to the death penalty.[67] It is of interest that the explanatory notes to the Protocol require the requested state to transmit its reasons for refusing extradition or return, but do not contemplate assurances of protection from torture in reply.[68]

Moreover, the guidelines elaborated by the Council of Europe's Group of Specialists on Human Rights and the Fight against Terrorism, adopted by the Committee of Ministers on July 15, 2002, reaffirm the absolute prohibition against torture in all circumstances "irrespective of the nature of the acts that the person is suspected of or for which he/she was convicted."[69] The guidelines also reaffirm the absolute nature of the prohibition on extradition to face such treatment: "[e]xtradition may not be granted when there is serious reason to believe that: i) the person whose extradition has been requested will be subjected to torture or to inhuman or degrading treatment or punishment."[70] No exceptions are permitted for either guideline.[71] The guidelines permit states to seek assurances that a person subject to surrender will not be subject to the death penalty, but no express provision is made for states to seek diplomatic assurances that a person subject to surrender will not be at risk for torture.[72]

---

[67] Article 4.
1 The text of Article 5 of the Convention shall become paragraph 1 of this article.
2 The text of Article 5 of the Convention shall be supplemented by the following paragraphs:
"2. Nothing in this Convention shall be interpreted as imposing on the requested State an obligation to extradite if the person subject of the extradition request risks being exposed to torture.
3. Nothing in this Convention shall be interpreted either as imposing on the requested State an obligation to extradite if the person subject of the extradition request risks being exposed to the death penalty or, where the law of the requested State does not allow for life imprisonment, to life imprisonment without the possibility of parole, unless under applicable extradition treaties the requested State is under the obligation to extradite if the requesting State gives such assurance as the requested State considers sufficient that the death penalty will not be imposed or, where imposed, will not be carried out, or that the person concerned will not be subject to life imprisonment without the possibility of parole." Protocol amending the European Convention for the Suppression of Terrorism, Strasbourg 15.V.2003 [online]
http://conventions.coe.int/Treaty/en/Treaties/Html/190.htm (retrieved March 26, 2004).

[68] "It is obvious that a State applying this article should provide the requesting State with reasons for its refusal to grant the extradition request. It is by virtue of the same principle that Article 18 paragraph 2 of the European Convention on Extradition provides that "reasons shall be given for any complete or partial rejection. . ." Draft Explanatory Report [online] http://conventions.coe.int/Treaty/EN/Reports/Html/090-rev.htm (retrieved March 26, 2004).

[69] Guideline IV, [online] http://www.coe.int/T/E/Human_rights/h-inf(2002)8eng.pdf (retrieved March 26, 2004).

[70] Ibid., Guideline XIII.

[71] Ibid., Guideline XV.

[72] Ibid., Guideline XIII(2)(i) and (ii). The same formula, obliging states to seek assurances with respect to the potential application of the death penalty, but making no similar provision for extraditions where a person is at risk of torture, is articulated in the Parliamentary Assembly of the Council of Europe resolution on combating terrorism and respect for human rights, Res. 1271(2002), January 24, 2002.

### *Jurisprudence of the European Court of Human Rights (ECHR)*

### *Chahal v. United Kingdom*

The European Court of Human Rights has addressed the issue of states' parties' reliance on diplomatic assurances as a safeguard against violations of states' obligations under article 3 (prohibition against torture) of the European Convention on Human Rights. In *Chahal v. United Kingdom*,[73] the court ruled that the return to India of a Sikh activist would violate the U.K.'s obligations under article 3, despite diplomatic assurances proffered by the Indian government that Chahal would not suffer mistreatment at the hands of the Indian authorities.[74] The court noted that:

> [T]he United Nations' Special Rapporteur on Torture has described the practice of torture upon those in police custody as "endemic" and has complained that inadequate measures are taken to bring those responsible to justice. . .The NHRC [Indian National Human Rights Commission] has also drawn attention to the problems of widespread, often fatal, mistreatment of prisoners and has called for a systematic reform of the police throughout India. . .Although the Court does not doubt the good faith of the Indian Government in providing the assurances mentioned above, it would appear that, despite the efforts of that Government, the NHRC and the Indian courts to bring about reform, the violation of human rights by certain members of the security forces in Punjab and elsewhere in India is a recalcitrant and enduring problem. . .Against this background, the Court is not persuaded that the above assurances would provide Mr. Chahal with an adequate guarantee of safety.[75]

The Chahal ruling is widely cited as an authoritative restatement by the court of the absolute nature of the prohibition against torture under the European Convention on Human Rights. Moreover, it establishes that diplomatic assurances are an inadequate guarantee where torture is "endemic," or a "recalcitrant and enduring problem" that results, in some cases, in fatalities. The court's acceptance that Indian assurances were given in good faith and that the government had embarked on reforms, but that serious abuses persisted, indicates that it took into account the credibility of the requesting government and whether the requesting government had effective control over the forces responsible for acts of torture.

---

[73] *Chahal v. United Kingdom*, 70/1995/576/662, November 15, 1996 [online]
http://www.worldlii.org/int/cases/IIHRL/1996/93.html (retrieved March 26, 2004).

[74] Ibid., para. 37.

[75] Ibid., paras. 104 and 105.

## Shamayev and 12 Others v. Georgia and Russia

In the subsequent case of *Shamayev and 12 Others v. Georgia and Russia*,[76] the European Court of Human Rights scrutinized assurances from the Russian government. In August 2002, Georgian authorities detained thirteen Chechens who had illegally crossed the border from Chechnya. The Russian authorities requested the men's extradition, claiming they were suspected of involvement in militant activities. In October, the European Court communicated to the Georgian government a request that the men not be extradited before the court had an opportunity to review their cases.[77] The court can make such a request—for "interim measures"—when there is a concern that a return might result in irreparable harm to a petitioner, potentially undermining his or her ability to proceed with an individual application before the court.[78] Despite the court's request, five of the Chechens were extradited from Georgia to Russia on October 4.[79] The Russian authorities subsequently offered diplomatic assurances, including guarantees of unhindered access for the Chechens to appropriate medical treatment, to legal advice, and to the European Court of Human Rights itself. The Russian government also made assurances that the applicants would not be subject to the death penalty and that their health and safety would be protected.[80] However, these assurances, procured after the

---

[76] Application No. 36378/02, October 4, 2002.

[77] These "interim measures" were requested under Rule 39 of the Rules of Court which state that: "The Chamber or, where appropriate, its President may, at the request of a party or of any other person concerned, or of its own motion, indicate to the parties any interim measure which it considers should be adopted in the interests of the parties or of the proper conduct of the proceedings before it.... The Chamber may request information from the parties on any matter connected with the implementation of any interim measure it has indicated. See Registrar of the European Court of Human Rights, Shamayev and 12 Others v. Georgia and Russia, (application no. 36378/02), Press Release No. 486, October 10, 2002 [online] http://www.echr.coe.int/eng/press/2002/oct/chechensvgeorgia%26russia.htm (retrieved March 26, 2004).

[78] Rule 39 of the Rules of the Court provides for interim measures. According to the International Commission of Jurists:

> Interim or provisional measures are an institution of international procedural law recognized within the framework of international disputes. The object and purpose of these measures is to preserve the rights claimed by the parties to the procedure until the dispute is settled by the competent international organ, as well as to ensure the integrity and effectiveness of the decision on the merits, while avoiding that harm be done to the rights claimed by the parties *pendente litis*, which would annul the effects of the action taken by the competent organ. Interim or provisional measures enable the State concerned to fulfill its obligation and to conform to the final decision of the international organ and, if need be, to proceed to reparation of the principle fact, which includes restitution when this is possible.

See *Amicus Curiae* by the International Commission of Jurists relating to the Interim Measures of the European Court of Human Rights (46827/99 Mamatkulov and 46951/99 Abdurasuloviç v. Turkey), October 2001 [online] http://www.icj.org/news.php3?id_article=3228&lang=en (retrieved March 24, 2004).

[79] Registrar of the European Court of Human Rights, *Shamayev and 12 Others v. Georgia and Russia*, (application no. 36378/02), Press Release No. 552, November 6, 2002 [online] http://www.echr.coe.int/eng/press/2002/nov/shamayevrule39%282%29epress.htm (retrieved March 26, 2004).

[80] Registrar of the European Court of Human Rights, *Shamayev and 12 Others v. Georgia and Russia*, (application no. 36378/02), Press Release No. 601, November 26, 2002 [online] http://www.echr.coe.int/eng/press/2002/nov/shamayev26.11.2002.htm (retrieved March 26, 2004).

men had been returned against the court's request, functioned more in the way of a diplomatic afterthought than an actual safeguard.

The subsequent course of events is instructive with respect to the difficulties inherent in relying upon diplomatic assurances. In September 2003, the European Court declared the individual applications of the Chechens admissible, and organized fact-finding missions to both Georgia and Russia, notifying both governments of the pending visits.[81] The Russian government, however, notified the court on October 20, 2003, that the Stavropol Regional Court, within whose jurisdiction the five extradited Chechens were detained, refused to grant the European Court delegation access to the applicants.[82] The European Court issued a strongly worded reply, reminding the Russian government that:

> [T]he local court was contacted purely out of courtesy. The issue of access to the applicants is a matter of international law—in particular the European Convention on Human Rights, which, under Russian law, takes precedence over domestic law—and, therefore, falls to be decided solely by the European Court of Human Rights. The Court drew attention to Article 38 § 1 of the Convention, which provides that the State concerned is to furnish all necessary facilities for the effective conduct of any investigation undertaken by the Court. Moreover, Article 34 of the Convention requires the High Contracting Parties not to hinder in any way the effective exercise of the right of individual application.[83]

The Russian authorities' failure to comply with assurances it made to the European Court itself is a striking illustration of the fact that mere accession to regional or international human rights instruments is no guarantee that a state will comply with the obligations enshrined in those instruments, or even with express assurances given to the European Court of Human Rights in the course of pending proceedings. Moreover, it raises again the question of whether assurances should ever be accepted as an adequate safeguard against potential torture when proffered by a state where torture and ill-

---

[81] Registrar of the European Court of Human Rights, *Shamayev and 12 Others v. Georgia and Russia,* (application no. 36378/02), Press Release No. 455. September 19, 2003 [online] http://www.echr.coe.int/eng/press/2003/sept/decisionshamayev%28admissible%2919092003.htm (retrieved March 26, 2003). The Court can engage in its own fact-finding under Rule 42 Sec. 2 of its Rules of Procedure (measures for taking evidence).

[82] Registrar of the European Court of Human Rights, *Shamayev and 12 Others v. Georgia and Russia,* (application no. 36378/02), Press Release No. 528, October 24, 2003 [online] http://www.echr.coe.int/Press/Eng/query.idq?CiRestriction=528&CiScope=E%3A%5Cdata%5Cinternet%5Cechr %5CEng%5CPress&CiMaxRecordsPerPage=10&TemplateName=query&CiSort=rank%5Bd%5D&HTMLQuery Form=query.htm (retrieved March 26, 2004).

[83] Ibid.

treatment are designated as endemic or systematic by credible sources, yet are routinely denied or left unaddressed by the state in question.[84]

A delegation from the European Court of Human Rights did conduct a fact-finding mission to Georgia on February 23-25, 2004, to visit the Chechen detainees there.[85] The details of that mission have not been made public. The delegation plans a similar mission to Russia in June 2004, twenty-one months after the five Chechens were extradited.

## Mamatkulov and Askarov v. Turkey

The case of *Mamatkulov and Askarov v. Turkey*,[86] currently pending before the Grand Chamber of the European Court of Human Rights, offers the court an opportunity to reaffirm the absolute nature of the prohibition against returning any person to a country where he or she would be at risk of torture or prohibited ill-treatment, despite the nature of their alleged crime and the offer of diplomatic assurances from a requesting government.

Rustam Mamatkulov and Abdurasulovic Askarov, nationals of Uzbekistan, were extradited from Turkey to Uzbekistan in March 1999 following diplomatic assurances from the Uzbek authorities that the men would not be subjected to the death penalty or torture, and that their property would not be confiscated.[87] The Uzbek authorities requested the extradition of Mamatkulov and Askarov based on allegations that the men—independent Muslims who were members of the Erk ("Freedom") Democratic Party of Uzbekistan, a banned opposition party—had been involved in terrorist-related activities against Uzbekistan, including involvement in a series of bombings in Tashkent in February 1999.[88]

---

[84] The European Committee for the Prevention of Torture (CPT) has repeatedly expressed concern about the torture and ill-treatment of Chechens in the Russian Federation. See, for example, CPT, "Public Statement Concerning the Chechen Republic of the Russian Federation," July 10, 2003 [online] http://www.cpt.coe.int/documents/rus/2003-33-inf-eng.htm (retrieved March 24, 2004); see also, Human Rights Watch, *Welcome to Hell: Arbitrary Detention, Torture, and Extortion in Chechnya*, October 2000; *Swept Under: Torture, Forced Disappearances, and Extrajudicial Killings during Sweep Operations in Chechnya,* March 2002.

[85] Email communication from the European Court of Human Rights Registry to Human Rights Watch, March 23, 2004.

[86] Mamatkulov and Abdurasulovic [Askarov] v. Turkey, Application Nos. 46827/99 and 46951/99 respectively. The judgment in the first chamber was issued on February 6, 2003 [online http://hudoc.echr.coe.int/hudoc/ViewRoot.asp?Item=0&Action=Html&X=323155210&Notice=0&Noticemode=&RelatedMode=0 (retrieved March 26, 2004; hereinafter "First Chamber Decision"). The title of the first chamber decision incorrectly identified Abdurasulovic Askarov as "Abdurasulovic;" subsequent Court documents correctly identify him as Askarov. In April 2003, the Turkish government appealed the February 2003 decision to the Court's President, requesting that the case be referred to the Grand Chamber, to be considered de novo before the entire panel of ECHR judges. A public hearing before the Grand Chamber was held on March 17, 2004. See Registrar of the European Court of Human Rights, Mamatkulov and Askarov v. Turkey, Press Release No. 131, March 17, 2004 [online] http://www.echr.coe.int/eng/press/2004/mar/HearingMamatkukovvTurkey170304.htm (retrieved March 26, 2004). A final decision on the case is forthcoming.

[87] *Mamatkulov and Askarov*, First Chamber Decision, February 6, 2003, para. 29.

[88] Independent Muslims in Uzbekistan practice their faith outside of state-run mosques, and pray at home or otherwise shun state control in determining and practicing their religion.

Prior to the extraditions, the European Court of Human Rights requested that the Turkish government not extradite the men until the court had a chance to review their applications to the court.[89] Despite this request, the Turkish government extradited the men. Mamatkulov and Askarov, along with twenty other defendants, were tried together in June 1999, found guilty, and sentenced to twenty and eleven years' imprisonment respectively.

The men's applications to the European Court of Human Rights alleged that they were at risk of torture and ill-treatment at the time of return (ECHR article 3); that they were subject to unfair extradition proceedings in Turkey and would be subject to an unfair trial upon return to Uzbekistan (article 6); and that Turkey hindered their right to lodge individual applications with the European Court by ignoring the court's request not to extradite (article 34).

The court's first chamber issued a decision in February 2003, finding no violation of article 3, despite the fact that the repression, torture, and abuse of independent Muslims and Erk members at the hands of the Uzbek authorities was well-documented in materials submitted to the court.[90] Indeed, it was widely recognized that Uzbekistan practiced systematic torture, with a particular focus on independent Muslims and members of the Erk party. The court was aware, for example, that the Czech Republic had declined to extradite fellow Erk member Muhammed Solih to Uzbekistan. Solih had been tried and convicted *in absentia* by the Supreme Court of Uzbekistan for allegedly masterminding the Tashkent bombings in 1999. In a December 2001 decision, a Prague court denied the extradition request in part on the grounds that Solih would be at risk of torture if returned to Uzbekistan.[91]

Significantly, the first chamber in *Mamatkulov* relied heavily upon the diplomatic assurances (in the form of two letters) proffered by the Uzbek authorities. It also cited the fact that in October 2001—two and one half years after the men were returned—Turkish officials visited the men in prison and found them in good health with no

---

[89] The question of whether or not requests for interim measures are legally binding on states' parties to the European Convention on Human Rights is a key issue in this case. See *Amicus Curiae* by the International Commission of Jurists relating to the Interim Measures of the European Court of Human Rights (46827/99 Mamatkulov and 46951/99 Abdurasuloviç v. Turkey), October 2001[online] http://www.icj.org/news.php3?id_article=3228&lang=en (retrieved March 24, 2004).

[90] The Court had available to it materials on repression of independent Muslims and ERK party members in Uzbekistan documenting abuse and concern by Amnesty International and the United Nations.

[91] The decision stated:

> [Solih] will almost certainly face torture and illegal imprisonment by Uzbek judicial bodies, as well as possible threat of death. Independent international organizations documented the systematic use of torture methods by the Uzbek police, in particular when dealing with political prisoners. In accordance with this, by extraditing [Solih], the Czech Republic would violate Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms..."

Judgment of the Prague City Court, Judge Veronika Boháčková presiding, December 14, 2001, on file with Human Rights Watch. The Court was aware of this decision as it was featured in Amnesty International materials submitted by Mamatkulov's and Askarov's lawyer.

complaints about their treatment, and referred to medical certificates resulting from sporadic examinations by state-employed prison doctors in 2000 and 2001.[92] The court acknowledged, however, that "to date, the applicants' representatives have been unable to contact the applicants" in Uzbekistan to verify independently that they had not been subjected to abuse.[93] The court found no violation of articles 3 or 6, but did find Turkey in violation of article 34 for not honoring the court's request not to extradite the men before their European Court applications were reviewed. The court held that such requests for the application of interim measures were binding on states' parties to the European Convention on Human Rights.

The first chamber's reliance upon diplomatic assurances from the Uzbek government and its finding that the Turkish government's follow-up monitoring constituted an adequate safeguard against torture and ill-treatment are deeply disturbing. The decision does not conform with the court's own jurisprudence, enshrined in *Chahal*, that diplomatic assurances cannot be relied upon when offered by a government in a country where torture is endemic, or a recalcitrant and enduring problem—terms the Court applied to India, and that surely applied to Uzbekistan in 1999 and today.

Moreover, the material submitted by Turkey as evidence that the Uzbek authorities had in fact honored the assurances—one prison visit by Turkish officials more than two years after the men were returned and medical certificates from prison doctors employed by the state—cannot be considered adequate. These minimal follow-up monitoring measures fall far short of the U.N. Special Rapporteur's requirement of a post-return monitoring system that reinforces unequivocal guarantees that a person will not be subject to torture upon return and for the duration of his stay in the country of return.

In January 2004, Human Rights Watch, in cooperation with the London-based Association for Individual Rights in Europe (AIRE Centre), submitted an *amicus curiae* brief to the Grand Chamber,[94] which is currently considering the *Mamatkulov* case on appeal. In the brief, Human Rights Watch presented detailed primary evidence that the men were at considerable risk of torture upon return, including cases of torture of similarly situated independent Muslims and Erk members, torture and ill-treatment of the two men's co-defendants, and torture of family members of the men's co-defendants. Evidence was also submitted confirming the incommunicado detention of the men up to and during their trial, and the complicity of Uzbek prison doctors in covering-up acts of torture. Human Rights Watch, which was the only international nongovernmental observer at the June 1999 trial, also submitted a detailed firsthand account of the defendants' lack of access to their lawyers of choice and to family members, and evidence of coerced incriminating statements used in court. Human Rights Watch provided evidence of torture and ill-treatment of human rights defenders

---

[92] First Chamber Decision, paras. 34-35.

[93] Ibid., para. 36.

[94] See Human Rights Watch, "Mamatkulov and Askarov v. Turkey: Intervention Submitted by Human Rights Watch and the AIRE Centre," January 28, 2004 [online] http://hrw.org/backgrounder/eca/turkey/eu-submission.pdf (retrieved March 26, 2004).

interested in the trial and of similarly situated independent Muslims in the immediate aftermath of the trial.

Human Rights Watch also provided commentary and case studies illustrating the inherent unreliability of diplomatic assurances from a country like Uzbekistan. Despite routine denials by authorities, the practice of systematic torture in Uzbekistan is well-documented, including by the U.N. Special Rapporteur on Torture.[95] The *Mamatkulov* case underscores the absence of procedural guarantees that offer an effective opportunity to challenge diplomatic assurances; and the fact that post-return monitoring is all too often an ineffective and inadequate measure to ensure compliance with diplomatic assurances.

A final decision in *Mamatkulov and Askarov v. Turkey* is expected in 2004.

### Examples of State Practice in the Council of Europe Region

There is no comprehensive study on the use of diplomatic assurances as a safeguard against extradition or return to torture or ill-treatment in the member states of the Council of Europe. A sampling of cases in the region, however, indicates that the judiciary often serves as an effective check on the use of diplomatic assurances as a safeguard against torture, and in key cases has held that such assurances are inadequate when proffered by a state with a well-documented record of torture and ill-treatment.

### United Kingdom: The Case of Akhmed Zakaev

The credibility of diplomatic assurances proffered by the Russian authorities came under scrutiny in the U.K. courts in 2003. In *Russia v. Zakaev*, Bow Street Magistrates' Court in London considered Russia's extradition request for the surrender of Akhmed Zakaev, an envoy for the Chechen government in exile, for alleged crimes committed in Chechnya in 1995 and 1996.[96] The Deputy Minister responsible for the Russian prison system gave testimony in court that Zakaev would come to no harm whilst in detention in Russia.[97] The extradition request was considered within the context of the Extradition Act 1989 (c. 33), the U.K. legislation incorporating the European Convention on Extradition.[98] The Act requires that a person not be surrendered if he might ". . .be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race,

---

[95] Report of the Special Rapporteur on Torture, Mission to Uzbekistan, E/CN.4/2003/68/add.2, February 3, 2003 [online]
http://www.unhchr.ch/Huridocda/Huridoca.nsf/0/29d0f1eaf87cf3eac1256ce9005a0170/$FILE/G0310766.doc (retrieved March 26, 2004).

[96] *The Government of the Russian Federation v. Akhmed Zakaev*, Bow Street Magistrates' Court, Decision of Hon. T. Workman, November 13, 2003 [online] http://www.tjetjenien.org/Bowstreetmag.htm (retrieved March 26, 2004).

[97] Ibid., page 7.

[98] The U.K. Extradition Act has since been amended. See Extradition Act 2003 [online] http://www.hmso.gov.uk/acts/acts2003/20030041.htm (retrieved March 26, 2004).

religion, nationality or political opinions."[99] The court thus undertook "an assessment of what might happen if [Zakaev] were returned" and to what extent those happenings could be attributed to his race, religion, nationality or political opinions.[100]

The U.K. court accepted that the trial process in Russia might be fair, but focused on "the conditions in which Mr. Zakaev would be likely to be detained and to consider whether they would have any prejudicial effect on his trial," in particular whether he would be at risk of torture if surrendered.[101] The court considered material from the European Committee for the Prevention of Torture and the U.N. Committee against Torture expressing concern about the continuing practice of torture and ill-treatment by Russian law enforcement officers operating in Chechnya.

In addition to testimony from former Russian officials about the specific vulnerability of Chechens in the Russian criminal justice system, including the increased risk to a near certainty that they will be tortured or ill-treated, the U.K. court heard evidence from a credible witness who said he made a statement, extracted under torture, to Russian authorities implicating Zakaev in the crimes of which he was accused. The court gave particular weight to this evidence stating that it was "clear, unequivocal and unshaken by cross-examination,"[102] and came to the "inevitable conclusion" that if the Russian authorities resorted to torturing a witness, "there is a substantial risk that Mr. Zakaev would himself be subject to torture;"[103] and that such treatment would be meted out as a consequence of Mr. Zakaev's nationality and political beliefs. With respect to Russian assurances that Mr. Zakaev would not be tortured, the U.K. court concluded:

> I am sure that he [Deputy Minister for Russian prisons] gave that assurance in good faith. I do, however, consider it highly unlikely that the Minister would be able to enforce such an undertaking, given the nature and extent of the Russian prison estate. I consider that such a guarantee would be almost impossible in any country with a significant prison population. I was also concerned as to the type of institution to which the defendant would be sent. Although the Minister indicated that he would be detained in a Ministry of Justice institution, another witness eventually confirmed that the decision could be taken by the Prosecutor who could choose to place Mr. Zakaev in an institution run by the FSB [Federal Security Service, which is active in Chechnya].[104]

---

[99] 1989 Act at Article 6(1)(d).

[100] *Russia v. Zakaev*, page 7.

[101] Ibid.

[102] Ibid., page 10.

[103] Ibid. page 10.

[104] Ibid., page 7.

In refusing to accept Russian assurances, the court in *Zakaev* relied on the fact that torture is widespread in Russia; that Chechens, in particular, are more likely than not to be tortured; that the Russian government cannot have effective control over the vast prison system in such a manner as to guarantee that Zakaev will not be tortured; and that Russian guarantees of placement in a specific detention facility cannot be relied upon. Extradition was refused.

## Germany: The Case of Metin Kaplan

A German court also recently rejected as insufficient diplomatic assurances offered by a government that used evidence procured by the torture of codefendants or witnesses in related criminal proceedings. In a 2003 decision, a German court ruled that a request from the Turkish government for the extradition of Metin Kaplan, the leader of a banned Islamic fundamentalist group, "Caliphate State," was politically motivated.[105] The court determined that the evidence on which the extradition warrant was based had been procured by the torture in detention of a group of Kaplan's followers, in violation of Article 15 of the Convention against Torture.[106] The court held that diplomatic assurances from the Turkish government that Kaplan's treatment and prosecution would conform with Turkey's human rights obligations would not provide Kaplan with "sufficient protection" against such violations.[107] Expressing concern about information extracted by torture and the independence of the Turkish State Security Court, the court stated in Kaplan that:

> …Such formal guarantees in an extradition proceeding can only provide sufficient protection in favor of the persecuted person if their correct implementation through the institutions of the requesting state—in this case the independent Turkish judiciary—can reliably be expected. The latter is not the case here.[108]

German authorities claimed that the decision not to extradite Kaplan was "regrettable" and pointed to "the repeated expressly confirmed promises of the Turkish government

---

[105] Oberlandesgericht Duesseldorf, in the case of Metin Kaplan, 4Ausl (a) 308/02-147.203-204.03III, May 27, 2003. Kaplan's group was banned in Germany in the aftermath of the September 11 attacks in the United States. In December 2003, German police conducted a nationwide operation against Kaplan's followers, taking many into custody. Metin Kaplan was released after questioning. See "German Police in Nationwide Sweep against Islamists," Agence France Presse, December 11, 2003; "Turkey: German Police in Raid against Turkish Extremist Group," Global News Wire, December 15, 2003; and "Banned Turkish Islamist Group Reportedly Still Active in Germany," BBC Monitoring International Reports, February 16, 2004.

[106] Oberlandesgericht Duesseldorf, in the case of Metin Kaplan, op. cit., page 15. Article 15 of the CAT reads: "Each state party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."

[107] Ibid., page 23.

[108] Ibid.

regarding the adherence to principles of the rule of law."[109] In a disturbing development, the government claimed that the court decision "does not stand in the way of expulsion, especially since the declarations of the Turkish government adequately guarantee that, after his expulsion to Turkey, Kaplan will not be subjected to treatment that violates the rule of law."[110] Minister of Interior Otto Schily claimed that "the right of a state to expel a foreigner in order to protect national security" should be the priority.[111]

The German government's response in the Kaplan case points to the essential role courts can play in interpreting a state's treaty obligations and evaluating the use of diplomatic assurances in light of those obligations. The German government's public statements raise serious concerns that it is actively attempting to circumvent the authority of its own judiciary. Subsequent news accounts revealed that Schily visited Ankara in September 2003 to secure enhanced assurances that Kaplan would get fair treatment upon return and that evidence extracted by torture would not be used in any proceedings again Kaplan.[112] The Turkish government declined to provide satisfactory assurances.[113] Kaplan remains in Germany.

## Austria: The Case of Mohamed Bilasi-Ashri

In November 2001, the Court of Appeal in Vienna ordered the extradition to Egypt of Mohamed Bilasi-Ashri, who had been sentenced *in absentia* in Egypt to fifteen years of hard labor for alleged involvement in an Islamic extremist group.[114] The court considered Bilasi-Ashri's claim that he would be at risk for torture or ill-treatment and would not be given a fair trial upon return, but concluded that "Egypt was not a country where serious large scale violations of human rights could be considered an institutionalised everyday practice …[t]hus there was no general obstacle to extradition."[115] The Court of Appeal dismissed evidence that members of Islamist groups in Egypt are frequently subjected to torture and ill-treatment, including electric shocks, beatings, burning and various forms of psychological abuse.[116] The court also

---

[109] Joint Statement German Federal Ministry of Interior and Ministry of Interior of North Rhine Westphalia, "Schily and Behrens Regret Decision of OLG Duesseldorf in Kaplan Case," Berlin, May 27, 2003.

[110] Ibid. The government was referring to immigration-related expulsion orders issued by the city of Cologne that Kaplan was challenging at the time. The government's statement also refers to the fact that Kaplan was challenging the removal of his refugee status in court as well.

[111] Ibid.

[112] "German Minister Pursues 'Caliph of Cologne' Extradition in Turkey," Deutsch Welle, September 16, 2003 [online] http://www.deutschewelle.de/english/0,1003,1432_A_972238_1_A,00.html (retrieved March 26, 2004). Deutsch Welle also reported that Schily told the newsmagazine Der Spiegel that the Kaplan case could become "a symbol for the weakness of our state" if it proves impossible to deport Kaplan." Ibid.

[113] "Germany, Turkey Fail to Agree on Extradition of Islamic Extremist," Deutsch Welle, September 17, 2003.

[114] Peter Finn, "Europeans Tossing Terror Suspects Out the Door," Washington Post, January 29, 2002, page A1.

[115] Descriptions of the Austrian court decision are taken from the European Court of Human Rights decision Bilasi-Ashri v. Austria, Application No. 3314/02, November 26, 2002, section A.5.

[116] Amnesty International, Concerns in Europe, July-December 2001 [online] http://web.amnesty.org/ai.nsf/Index/EUR010022002?OpenDocument&of=COUNTRIES\AUSTRIA (retrieved March 25, 2004).

determined that Bilasi-Ashri's pending asylum application did not preclude his extradition.[117]

Despite the surprising finding that Bilasi-Ashri's fear of torture was unfounded, however, the Court of Appeal in its ruling conditioned his extradition upon receiving diplomatic assurances from the Egyptian authorities that Bilasi-Ashri's conviction *in absentia* would be declared null and void, that he would be retried before an ordinary (civilian) criminal court and would not be persecuted or suffer restrictions upon his personal freedom.[118] On November 12, 2001 the Austrian Federal Minister of Justice approved the extradition, subject to the conditions set forth in the Court of Appeal decision, and added the condition that Bilasi-Ashri be permitted to leave Egyptian territory within forty-five days in the case of acquittal.

In spite of the requirement of diplomatic assurances, Amnesty International issued an "urgent action" on behalf of Bilasi-Ashri on January 4, 2002, stating that he would be at risk of torture or ill-treatment if returned.[119] Austrian authorities subsequently requested permission from the Egyptian government to visit Bilasi-Ashri upon Austria's request after his return to Egypt.[120] In March 2002, the United Nations High Commissioner for Refugees requested that Austria grant Bilasi-Ashri refugee status on the basis that he had a well-founded fear of persecution if returned.[121] In March and April 2002, the European Court of Human Rights requested that Austria not return Bilasi-Ashri until the Court reviewed his case. (Bilasi-Ashri had originally lodged his petition with the court in June 2000, but was subsequently detained pending extradition.)

The Egyptian authorities subsequently rejected the conditions laid out in the extradition order and Bilasi-Ashri was released from detention in Austria in August 2002. The fact that the extradition order required Egypt's compliance with articles 3 and 6 of the European Convention on Human Rights, and that the Egyptian authorities refused such compliance, indicate that Bilasi-Ashri's fears that he would be at risk of torture or ill-treatment and subject to an unfair trial were well-founded.

---

[117] See Sibylle Kapferer, *The Interface between Extradition and Asylum*, UNHCR, op. cit., para. 29: "Where an extradition request concerns an asylum seeker, the requested State will not be in a position to establish whether extradition is lawful unless the question of refugee status is clarified. The determination of whether or not the person concerned has a well-founded fear of persecution must therefore precede the decision on extradition. This does not of itself require suspension of the extradition procedure. It does mean, however, that the decision of the extradition should only be made after the final determination on refugee status, even if extradition and asylum proceedings are conducted in parallel."

[118] *Bilasi-Ashri v. Austria*, section A.5.

[119] AI Index: Eur 13/001/2002, January 4, 2002 [online] http://web.amnesty.org/library/Index/ENGEUR130012002?open&of=ENG-AUT (retrieved March 26, 2004).

[120] *Bilasi-Ashri v. Austria*, section A.5.

[121] Ibid.

*Sweden: The Cases of Ahmed Agiza and Mohammed al-Zari*

Sweden's return of two Egyptian asylum seekers to Cairo in December 2001 illustrates well both the lack of reliability of diplomatic assurances and the difficulties of implementing an effective and adequate post-return monitoring system that ensures that the government of return complies with the terms of the diplomatic assurances.

Ahmed Agiza and Mohammed al-Zari, both Egyptian nationals who had sought asylum in Sweden, were expelled from Sweden and forcibly returned to Egypt on December 18, 2001. Their asylum applications were rejected, despite acknowledgement by the Swedish authorities that the two men had a well-founded fear of persecution in their home country. The men were excluded from refugee status based on secret evidence provided by the Swedish security police (Säpo) that the men were associated with Islamist groups responsible for terrorist acts.[122] The secret evidence against the men was not disclosed in full to either the men or their lawyers, and there was no right to appeal the expulsions, which were executed the very same day they were ordered.[123]

The expulsions followed diplomatic assurances by the Egyptian government that the men would not be subjected to torture or ill-treatment upon return, and that they would not be sentenced to death. Assurances were also given that the men would be afforded fair trials in Egypt, including a re-trial for Agiza, who had been tried and convicted *in absentia* by an Egyptian military court in April 1999.[124] Arrangements for the Swedish government to be granted access to monitor the trials and to visit the men in prison were not specified in the assurances, but apparently were agreed with the Egyptian authorities in advance.

Swedish authorities subsequently claimed that "[o]n the basis of these assurances the Government of Sweden made the assessment that the assurances obtained provided an adequate guarantee of safety in accordance with international law and that Sweden, thus, did not act in breach of its commitments under international law."[125] The men's

---

[122] The Swedish Aliens Act—Utlänningslagen (1989)—grants the government powers to decide on the expulsion of foreign citizens who are considered a national security threat, including asylum seekers with pending claims, although it explicitly prohibits the execution of such decisions in cases where the returnee may risk torture or the death penalty. See also Sibylle Kapferer, *The Interface between Extradition and Asylum*, op. cit., footnote 117, regarding the relationship between asylum and extradition.

[123] In connection with its decision to expel al-Zari and Agiza, the Swedish government also decided to return Agiza's wife, Hanan Attia, and her five children. Following an individual communication on her behalf to the U.N. Committee against Torture, however, and the Committee's subsequent request that the Swedish government delay deportation until it has had an opportunity to examine the case, the deportation was put on hold and Attia and her children remained in Sweden, pending the Committee's decision on her case. The CAT decision was issued in November 2003 finding no violation of CAT article 3 (see section on CAT and Hanan Attia case above). Attia's lawyer subsequently submitted a new asylum application for Attia and her children, which is currently pending. They remain in Sweden at date of writing. See Human Rights Watch, "Call for Full and Fair Asylum Determination Procedure: Letter to Swedish Government on behalf of Hanan Attia" *A Human Rights Watch Letter,* December 17, 2003 [online] http://hrw.org/english/docs/2003/12/18/sweden6761.htm (retrieved March 26, 2004).

[124] Letters detailing the diplomatic assurances on file with Human Rights Watch.

[125] Submission of the Swedish government to the U.N. Human Rights Committee ("Information requested by the Human Rights Committee from the Government of Sweden"), May 6, 2003, on file with Human Rights Watch. In

---

treatment upon return and the obvious shortcomings of the Swedish monitoring scheme, however, raise serious concerns that the Swedish government has violated its absolute obligation not to return a person to a country where he is at risk of torture or ill-treatment.

Upon return, Agiza and al-Zari were held for five weeks in incommunicado detention. No representative from the Swedish government visited the men during that time.[126] Eventually Swedish diplomatic representatives did begin visiting the men in prison, "more or less on a monthly basis,"[127] but none of the visits has been conducted in private. The Swedish delegation is always accompanied by prison authorities during the visits, and never left alone with the detainees. The delegation has met only with both detainees at the same time and the meetings have taken place in the office of the prison director, sometimes with up to ten prison officials present—never in the men's own cells, which the Swedish officials have not been allowed to visit.[128] Swedish officials' apparent lack of expertise at detecting signs of torture or ill-treatment raise further concerns about the failure to conduct private visits; the men obviously would be far less inclined to speak freely about possible abuse or to reveal possible physical injuries resulting from such abuse in the absence of assurances of absolute confidentiality. Moreover, the Swedish embassy agreed to give several days' notice to the prison director before each visit. The failure of the Swedish authorities to conduct visits in private and the consequent lack of confidentiality do not conform with international standards governing prison monitoring visits.[129]

Despite Swedish government claims to the contrary, information available from additional credible sources raises serious concern that the men have in fact been subjected to torture and ill-treatment since their return to Egypt, and remain vulnerable to such abuse. Given the serious deficits in the post-return monitoring scheme, including the absence of completely confidential access to the men, the Swedish government cannot unequivocally guarantee that the men have been treated in full conformity with the diplomatic assurances. Moreover, Mohammed al-Zari was released from prison in

---

communications with Human Rights Watch, Swedish authorities have readily admitted that the decision to expel the men was a very difficult one, and explained that this was especially so because Sweden had never before expelled anyone based on diplomatic assurances.

[126] Sweden's failure to visit the men during the initial stages of their detention in Egypt is all the more disconcerting in light of reports that they were held incommunicado at an interrogation center of the State Security Intelligence Service outside Cairo during this time. They were subsequently transferred to the Mazraat Tora prison. As noted above, detainees are most vulnerable to torture and ill-treatment in the first days of detention.

[127] Submission of the Swedish government to the U.N. Human Rights Committee ("Information requested by the Human Rights Committee from the Government of Sweden"), May 6, 2003, on file with Human Rights Watch.

[128] Mohammed al-Zari was released in October 2003, thus visits with both men present ended at the time of his release.

[129] See U.N. Special Rapporteur on Torture, General Recommendations, E/CN.4/2003/68, para. (f) regarding prison monitoring and private visits [online] http://www.unhchr.ch/html/menu2/7/b/torture/recommendations.doc (retrieved on March 26, 2004).
See also, International Committee of the Red Cross, "How Visits by the ICRC can Help Prisoners Cope with the Effects of Traumatic Stress," Section on Private and Confidential Interviews with Prisoners, January 1, 1996 [online] http://www.icrc.org/web/eng/siteeng0.nsf/iwpList302/219CF73383F594D2C1256B660059956E (retrieved March 26, 2004).

October 2003, after being held for nearly two years without charge. He remains under constant surveillance by the Egyptian security forces and is required to report for regular interrogations, but there is no evidence that the Swedish authorities are monitoring his treatment.

The Swedish authorities have also made little headway in terms of securing a fair trial for Ahmed Agiza. In late March 2004, more than two years after Agiza's return, the Egyptian authorities ordered a retrial, but again before a military tribunal where fair trial standards are not respected. It remains unclear what action, if any, the Swedish government is taking in the face of the Egyptian authorities' failure to honor a key condition for return of the two men. This failure amounts to a breach of the diplomatic assurances upon which the Swedish authorities based the expulsions.

Both men have cases pending in other fora; Agiza has lodged an individual application with the U.N. Committee against Torture and al-Zari has lodged an application with the European Court of Human Rights.

# RECOMMENDATIONS

Human Rights Watch is deeply concerned that governments are increasingly relying on diplomatic assurances as a device to circumvent the obligation not to return any person to a place where he or she would be at risk of torture or ill-treatment. The concern derives from the many examples in this paper, indicating a trend that seriously undermines the absolute prohibition against torture and ill-treatment. The use of diplomatic assurances threatens to erode the decades-long work of governments—in close alliance with civil society—to eradicate torture. It would be tragic indeed if the actions of terrorists resurrected torture as a legitimate means of interrogation and control.

Human Rights Watch calls on all governments to:

- Reaffirm the absolute nature of the obligation not to return any person to a country where there are substantial grounds for believing that he or she may be in danger of being subjected to torture or prohibited ill-treatment, in full conformity with international law;

- Prohibit reliance upon diplomatic assurances under any circumstances to circumvent the absolute obligation not to return any person to a country where there are substantial grounds for believing that he or she may be in danger of being subjected to torture or prohibited ill-treatment;

- Declare reliance upon diplomatic assurances per definition unacceptable in circumstances where there is substantial and credible evidence that torture and prohibited ill-treatment in the country of return are systematic, widespread, endemic, or a "recalcitrant or persistent" problem; where governmental authorities do not have effective control over the forces in their country that perpetrate acts of torture and ill-treatment; or where the government consistently targets members of a particular racial, ethnic, religious, political or other identifiable group for torture or ill-treatment and the person subject to return is associated with that group;

- Ensure that any person subject to return has the effective opportunity, in conformity with internationally recognized procedural guarantees, to challenge the legality of the return—including the reliability of any diplomatic assurances provided and the adequacy of any proposed post-return monitoring arrangements—prior to return before an independent tribunal and with the right of appeal.

<u>Human Rights Watch calls on the U.N. Special Rapporteur on Torture to:</u>

- Undertake an in-depth inquiry focusing exclusively on the practice of states' reliance on diplomatic assurances, elaborating clear criteria and standards for their use with the purpose of reaffirming the absolute nature of the prohibition against returning any person to a country where there are substantial grounds for believing that he or she may be in danger of being subjected to torture or prohibited ill-treatment, and with the goal of ensuring full respect by U.N. member states for that legal obligation.

# ACKNOWLEDGEMENTS

Julia Hall, counsel and senior researcher in the Europe and Central Asia Division of Human Rights Watch, researched and wrote this report. Acacia Shields and Diederik Lohman, senior researchers in the Europe and Central Asia Division, and Kristina Alessi, associate in the Europe and Central Asia Division, provided valuable additional research. The report was edited by Ben Ward, counsel in the Europe and Central Asia Division and Iain Levine, program director for Human Rights Watch. Dinah PoKempner, general counsel for Human Rights Watch, provided legal review. Veronika Leila Szente Goldston, advocacy director in the Europe and Central Asia Division, reviewed and provided valuable commentary on the text. Portions of the manuscript were also reviewed by Rachel Denber, acting executive director in the Europe and Central Asia Division, and Wendy Patten, advocacy director in the U.S. Program of Human Rights Watch. Anna Sinelnikova, associate in the Europe and Central Asia Division, provided invaluable production support. Special thanks to Ernest Ulrich, consultant to Human Rights Watch, for translation services.

Human Rights Watch gratefully acknowledges the contributions made to this report by a number of valued colleagues, including Anna Wigenmark, Swedish NGO Foundation for Human Rights; Julia Duchrow, Amnesty International Germany; Madeleine Siedlitz, Amnesty International Sweden; Peter Rosenblum, director, and Johanna Westeson, Adria Perez, and Lauren Butcher, students in the Columbia Law School Human Rights Clinic; and Nuala Mole, Association for Individual Rights in Europe (AIRE Centre).