

# The United States' "Disappeared"

## The CIA's Long-Term "Ghost Detainees"

### A Human Rights Watch Briefing Paper
### October 2004

I. Executive Summary ................................................................................. 1

II. Background ........................................................................................... 3

III. The Central Intelligence Agency: "Ghost Detainees" and "Disappearances" ............ 5

   High-Level "Ghost Detainees" in Prolonged Incommunicado Detention .................... 8

   Refusal to Disclose the Fate or Whereabouts of the Detainees ....................... 8

   Allegations of Mistreatment ..................................................................... 10

   Intelligence Collection ........................................................................... 13

IV. "Disappearances" in Law and History .............................................................. 16

   The Definition of "Forced Disappearances" in International Law .......................... 18

   The Absolute Ban on "Disappearances" ..................................................... 20

   Legal Prohibitions on Incommunicado Detention........................................... 20

V. Recommendations to the United States Government: ...................................... 22

VI. Acknowledgements ................................................................................. 23

VII. Annex: Eleven Detainees in Undisclosed Locations...................................... 24

   1. Ibn al-Shaikh al-Libi (Libya) .............................................................. 24

   2. Abu Zubayda, a.k.a. Zubeida, Zain al-`Abidin Muhammad Husain, `Abd al-
   Hadi al-Wahab (Palestinian) .................................................................. 25

   3. Omar al-Faruq (Kuwait) ..................................................................... 27

   4. Abu Zubair al-Haili, a.k.a. Fawzi Saad al-`Obaydi (Saudi Arabia.................... 29

   5. Ramzi bin al-Shibh (Yemen) ................................................................ 31

   6. Abd al-Rahim al-Nashiri, a.k.a. Abu Bilal al-Makki, Abdul Rahman Husain
   al-Nashari, formerly Muhammad Omar al-Harazi (Saudi Arabia or Yemen—
   Born in Mecca, Saudi Arabia ................................................................. 32

   7. Mustafa al-Hawsawi (Saudi Arabia) ...................................................... 35

8. Khalid Shaikh Muhammad, a.k.a. Shaikh Muhammad, Ashraf Ref`at Nabith Henin, Khalid `Abd al-Wadud, Salem `Ali, Fahd bin Abdullah bin Khalid (Kuwait).................................................................................................................. 36

9. Waleed Muhammad bin Attash, a.k.a. Tawfiq ibn Attash, Tawfiq Attash Khallad (Yemen) ........................................................................................... 39

10. Adil al-Jazeeri (Algeria) ............................................................................... 40

11. Hambali, a.k.a. Riduan Isamuddin (Indonesia) ......................................... 42

# I. Executive Summary

The prisoner was taken away in the middle of the night nineteen months ago. He was hooded and brought to an undisclosed location where he has not been heard of since. Interrogators reportedly used graduated levels of force on the prisoner, including the "water boarding" technique – known in Latin America as the "submarino" – in which the detainee is strapped down, forcibly pushed under water, and made to believe he might drown. His seven- and nine-year-old sons were also picked up, presumably to induce him to talk.

These tactics are all too common to oppressive dictatorships. The interrogators were not from a dictatorship, however, but from the U.S. Central Intelligence Agency (CIA). The U.S.'s prisoner is Khalid Shaikh Muhammad, the alleged principal architect of the September 11 attacks. Muhammad is one of the dozen or so top al-Qaeda operatives who have simply "disappeared" in U.S. custody.

In the aftermath of the September 11, 2001 attacks on the United States, the Bush administration has violated the most basic legal norms in its treatment of security detainees. Many have been held in offshore prisons, the most well known of which is at Guantánamo Bay, Cuba. As we now know, prisoners suspected of terrorism, and many against whom no evidence exists, have been mistreated, humiliated, and tortured. But perhaps no practice so fundamentally challenges the foundations of U.S. and international law as the long-term secret incommunicado detention of al-Qaeda suspects in "undisclosed locations."

"Disappearances" were a trademark abuse of Latin American military dictatorships in their "dirty war" on alleged subversion. Now they have become a United States tactic in its conflict with al-Qaeda.

The CIA's "disappeared" prisoners also include Abu Zubayda, a close aide of Osama bin Laden, Ramzi bin al-Shibh, who but for his failure to get a U.S. visa might have been one of the 9/11 hijackers, Hambali, a key al-Qaeda ally in southeast Asia, and Abd al-Rahim al-Nashiri, allegedly the mastermind of the U.S.S. *Cole* bombing.

According to the Independent Panel to Review Department of Defense Detention Operations chaired by former Defense Secretary James Schlesinger, the CIA has been "allowed to operate under different rules" from the U.S. military. Those rules stem in

part from an August 2002 Justice Department memo, responding to a CIA request for guidance, which said that torturing al-Qaeda detainees "may be justified," and that international laws against torture "may be unconstitutional if applied to interrogations" conducted in the war on terrorism.

Some of the detainees, such as Khalid Shaikh Muhammad, are indeed reported to have been tortured in custody. Many are said to have provided valuable intelligence, intelligence that has foiled plots and saved lives. Some are said to have lied under duress to please their captors. (Ibn al-Shaikh al-Libi apparently fabricated the claim, then relayed by Secretary of State Colin Powell to the United Nations, that Iraq had provided training in "poisons and deadly gases" for al-Qaeda.) The United States has acknowledged the detention of many, but not that of others. The one thing all the detainees have in common is that the United States has refused to disclose their whereabouts and has refused to allow them access to their families, lawyers or the International Committee of the Red Cross.

These are not nice men, to say the least. They are alleged to have committed the most diabolical criminal acts. Why, some have argued, should we care about what happens to them?  First, because despite the life-saving information apparently gleaned from some of these suspects, overall the U.S. treatment of its prisoners has been a boon rather than a setback for al-Qaeda and has thereby made the world less safe from terror. As the 9/11 Commission recognized, "Allegations that the United States abused prisoners in its custody make it harder to build the diplomatic, political, and military alliances the government will need."[1] Second, because the U.S.'s torture and "disappearance" of its adversaries invites all the unsavory governments in the world to do the same – indeed countries from Sudan to Zimbabwe have already cited Abu Ghraib and other U.S. actions to justify their own practices or to blunt criticism.

But the primary concern must stem, first and foremost, from the acceptance of methods which are antithetical to a democracy and which betray the U.S.'s identity as a nation of law. For al-Qaeda, the ends apparently justify the means, means which have included smashing hijacked planes into buildings and bombing train stations and places of worship. The United States should not endorse that logic.

---

[1] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 379. In Iraq, "Brig. Gen. Mark Kimmitt, the chief spokesman for the U.S. military in Iraq, acknowledged…that winning over Iraqis before the planned handover of some sovereign powers next month had been made considerably harder by the photos." (Wilson, Scott and Sewell Chan, "As Insurgency Grew, So Did Prison Abuse," *Washington Post*, May 10, 2004.)

The United States is employed, as it must be, in defending itself and its people against attacks from al-Qaeda and its allies. Human Rights Watch recognizes, of course, the importance of effectively and rapidly gathering intelligence in order to trace the al-Qaeda and other networks, capture other terrorists, and intervene to prevent more catastrophic terror attacks.

However, the use of forced disappearances and secret incommunicado detention violates the most basic principles of a free society. When Argentina tortured and "disappeared" suspected dissidents in the name of fighting what it characterized as "terrorists," it was wrong. When the United States tortures and "disappears" alleged terrorists, even those suspected of plotting the most terrible attacks, it is also wrong. That the terror being fought by the United States is of a different character does not change the illicit nature of the methods employed to combat it.

This report provides a comprehensive overview of what we know about the United States' "disappeared," and includes an appendix detailing the facts of eleven cases for which there is some publicly available information. There may well be several or many more such detainees. The report also provides historical context on "disappearances," tracing the practice to its roots in Nazi Germany during World War II, and identifies the specific provisions of U.S. and international law that outlaw the practice.

## II. Background

Many of the practices developed by the United States since September 11, 2001 in relation to detainees captured in the "global war on terror" appear designed to evade judicial or other scrutiny of the detentions and of the interrogation of these detainees. These include the creation of offshore prisons, the most well known of which is at Guantánamo Bay, Cuba. The administration deliberately chose Guantánamo as a detention center in an attempt to put the detainees beyond the jurisdiction of the U.S. courts—and thus of any courts, anywhere.[2] On June 28, 2004, the United States

---

[2] Patrick F. Philbin and John C. Yoo, Memorandum for William J. Haynes II, General Counsel, Department of Defense, "Possible Habeas Jurisdiction over Aliens Held in Guantánamo Bay, Cuba," December 28, 2001, accessible at http://www.msnbc.msn.com/id/5022681/site/newsweek. Indeed, in response to a legal challenge by several detainees, the U.S. government later argued that U.S. courts would not have jurisdiction over these detainees even if they were being tortured or summarily executed. See *Gherebi v. Bush*, 9th Circuit, December 18, 2003. (The United States asserts the power "to do with [them] as it will, when it pleases, without any compliance with any rule of law of any kind, without permitting [them] to consult counsel, and without acknowledging any judicial forum in which its actions may be challenged. ... Indeed, at oral argument, the government advised us that its position would be the same even if the claims were that it was engaging in acts of torture or that it was summarily executing the detainees. To our knowledge, prior to the current detention of prisoners at Guantánamo, the U.S. government has never before asserted such a grave and startling

Supreme Court rejected the administration's position and ruled that the U.S. courts have jurisdiction to hear the detainees' habeas corpus challenges to the legality of their detention.[3] However, the United States is also believed to be holding detainees at some 39 other overseas prisons in Afghanistan, Iraq, and elsewhere.[4]

Another practice the United States has used to avoid scrutiny has been the transfer of detainees to countries in the Middle East known to practice torture routinely. The *Washington Post* in December 2002 described the rendition of captured al-Qaeda suspects from U.S. custody to other countries, such as Syria, Uzbekistan, Pakistan, Egypt, Jordan, Saudi Arabia, and Morocco, where they were tortured or otherwise mistreated. One official was quoted as saying, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them."[5] In one case, Maher Arar, a Syrian-born Canadian in transit from a family vacation through John F. Kennedy airport in New York, was detained by U.S. authorities. After holding him for nearly two weeks, U.S. authorities flew him to Jordan, where he was driven across the border and handed over to Syrian authorities, despite his statements to U.S. officials that he would be tortured in Syria and his repeated requests to be sent home to Canada. Mr. Arar, whom the United States asserts has links to al-Qaeda, was released without charge from Syrian custody ten months later and has described repeated torture, often with cables and electrical cords, during his confinement in a Syrian prison.[6]

Among the most disturbing cases, perhaps unprecedented in U.S. history, are the detainees who have simply "disappeared" in U.S. custody.

---

proposition. …a position so extreme that it raises the gravest concerns under both American and international law.")

[3] *Rasul et al. v. Bush, President of the United States, et al.*, Nos. 03-334 and 03-343; p. 17. In a related decision, the Supreme Court held that "Due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker" (*Hamdi et al. v. Rumsfeld, Secretary of Defense, et al.*, No. 03-6696; p. 1).

[4] See Human Rights First, "Ending Secret Detentions," June 2004; See also Human Rights Watch, "'Enduring Freedom': Abuses by U.S. Forces in Afghanistan," March 2004 [online], http://www.hrw.org/reports/2004/afghanistan0304/; and Human Rights Watch, "Iraq: Background on U.S. Detention Facilities in Iraq," May 7, 2004 [online], http://www.hrw.org/english/docs/2004/05/07/iraq8560.htm.

[5] Dana Priest and Barton Gellman, "U.S. Decries Abuse but Defends Interrogations," *Washington Post*, December 26, 2002.

[6] The United States has refused to cooperate with an official Canadian inquiry into the Arar rendition. For other rendition cases, see Human Rights Watch, "Empty Promises: Diplomatic Assurances No Safeguard against Torture," April 2004 [online], http://hrw.org/reports/2004/un0404/.; Human Rights Watch, "The Road to Abu Ghraib," June 2004 [online], http://www.hrw.org/reports/2004/usa0604/.

### III. The Central Intelligence Agency: "Ghost Detainees" and "Disappearances"

In June 2004, U.S Secretary of Defense Donald Rumsfeld admitted that, acting upon a request by George Tenet, then-director of the CIA, he ordered an Iraqi national held in Camp Cropper, a high security detention center in Iraq, to be kept off the prison's rolls and not presented to the International Committee of the Red Cross. The prisoner, referred to as "Triple X," was reportedly a senior member of Ansar al-Islam, an organization apparently at the origin of several attacks in Iraq and linked to Al-Qaeda.[7] Rumsfeld also admitted that there have been other cases in which detainees have been held secretly.[8]

Earlier, a U.S. Army investigation into the abuses of detainees at Abu Ghraib prison in Iraq sharply criticized this practice of keeping "ghost detainees." According to the report of Maj. Gen. Antonio Taguba:

The various detention facilities operated by the 800th MP Brigade have routinely held persons brought to them by Other Government Agencies (OGAs) [i.e. the CIA] without accounting for them, knowing their identities, or even the reason for their detention. The Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib called these detainees "ghost detainees." On at least one occasion, the 320th MP Battalion at Abu Ghraib held a handful of "ghost detainees" (6-8) for OGAs that they moved around within the facility to hide them from a visiting International Committee of the Red Cross (ICRC) survey team. *This maneuver was deceptive, contrary to Army Doctrine, and in violation of international law.*[9]

An Army report into intelligence activities at Abu Ghraib spoke of eight "ghost" detainees there who were kept off the prison's roster at the CIA's request. In one of those cases, in November 2003, a detainee brought to the prison by C.I.A. employees

---

[7] Secretary Rumsfeld's order led to a detention of seven months, during which the detainee was interrogated only once. See Eric Schmitt and Thom Shanker, "Rumsfeld Issued an Order to Hide Detainee in Iraq," *New York Times*, June 17, 2004. See also Thom Shanker, "Rumsfeld Admits He Told Jailers to Keep Detainee in Iraq out of Red Cross View," *New York Times*, June 17, 2004.

[8] Josh White, "Rumsfeld Authorized Secret Detention of Prisoner," *Washington Post*, June 18, 2004. ("There are instances where that occurs," Rumsfeld said. "And a request was made to do that and we did.")

[9] Maj. Gen. Antonio M. Taguba: "Article 15-6 Investigation of the 800th Military Police Brigade," (an investigative report, on alleged abuses at U.S. military prisons in Abu Ghraib and Camp Bucca, Iraq), para. 33, emphasis added.

but never formally registered with military guards died at the site, and his body was removed after being wrapped in plastic and packed in ice.[10]

In later Congressional testimony, Gen. Paul Kern, the senior officer who oversaw the Army inquiry, told the Senate Armed Services Committee, "The number [of ghost detainees] is in the dozens, to perhaps up to 100." Another Army investigator, Maj. Gen. George Fay, put the figure at "two dozen or so." Both officers said they could not give a precise number because no records were kept and because the CIA refused to provide information to the investigators.[11]

### The CIA's "Different Rules"

According to the Independent Panel to Review DoD Detention Operations chaired by former Defense Secretary James Schlesinger, "the CIA was allowed to operate under different rules."[12] It is not clear what these rules are, however. The Army report into intelligence activities at Abu Ghraib found that "the perception that non-DOD agencies [i.e. the CIA] had different rules regarding interrogation and detention operations was evident."[13] The investigators complained that "The lack of OGA [CIA] adherence to the practices and procedures established for accounting for detainees eroded the necessity in the minds of Soldiers and civilians for them to follow Army rules."[14] They concluded that "CIA detention and interrogation practices led to a loss of accountability, abuse, reduced interagency cooperation and an unhealthy mystique that further poisoned the atmosphere at Abu Ghraib."

The CIA's "different rules" in the "global war on terror" can be traced in part to a secret August 1, 2002, Justice Department memorandum to Alberto Gonzales, the White House counsel, in response to a CIA request for guidance.[15] That memo, prepared by Assistant Attorney General Jay S. Bybee (now a federal appeals court judge) said that torturing al-Qaeda detainees in captivity abroad "may be justified," and that international laws against torture "may be unconstitutional if applied to interrogations" conducted in

---

[10] MG George R. Fay, *AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade,* 2004 [online], http://news.findlaw.com/hdocs/docs/dod/fay82504rpt.pdf, pp. 53-54.

[11] Senate Armed Services Committee, Investigation of the 205th Military Intelligence Brigade at Abu Ghraib Prison, Iraq, September 9, 2004. According to General Kern, "A ghost detainee, by our definition, is a person who has been detained in a U.S. facility and has not been recorded."

[12] "Report of Independent Panel to Review DoD Detention Operations," p. 70.

[13] LTG Anthony R. Jones and MG George Fay, "AR 15-6 Investigation of Intelligence Activities at Abu Ghraib," p. 4

[14] Ibid., pp. 44-45.

[15] Dana Priest and R. Jeffrey Smith, "Memo Offered Justification for Use of Torture," *Washington Post,* June 8, 2004.

the war on terrorism. The memo added the doctrines of "necessity and self-defense could provide justifications that would eliminate any criminal liability" on the part of officials who tortured al-Qaeda detainees. The memo also took an extremely narrow view of which acts might constitute torture. It referred to seven practices that U.S. courts have ruled to constitute torture: severe beatings with truncheons and clubs, threats of imminent death, burning with cigarettes, electric shocks to genitalia, rape or sexual assault, and forcing a prisoner to watch the torture of another person. It then advised that "interrogation techniques would have to be similar to these in their extreme nature and in the type of harm caused to violate law."[16] The memo asserted that "physical pain amounting to torture must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death." The memo also suggested that "mental torture" only included acts that resulted in "significant psychological harm of significant duration, e.g., lasting for months or even years."

In June 2004, after the Bybee memo came to public light in the wake of the Abu Ghraib scandal, administration officials disavowed it, and said that it would be re-written.[17]

Press reports cited unnamed U.S officials as saying that the Bybee memo was prepared after a debate within the government about the methods used to interrogate alleged al-Qaeda leader Abu Zubayda (see below) after his capture in April 2002.[18] Reports suggest that CIA interrogation methods were authorized by a secret set of rules that were endorsed by the U.S. Justice Department and the White House. These were said to include feigned drowning and refusal of pain medication for injuries.[19] Indeed, according to the *New York Times*, "The methods employed by the CIA are so severe that senior officials of the Federal Bureau of Investigation have directed its agents to stay out of many of the interviews of the high-level detainees, counterterrorism officials said. The F.B.I. officials have advised the bureau's director, Robert S. Mueller III, that the

---

[16] Jay S. Bybee, "Memorandum for Alberto R. Gonzales, Counsel to the President," Office of Legal Counsel, Justice Department, [online], http://news.findlaw.com/wp/docs/doj/bybee80102mem.pdf. This memorandum has since been repudiated by the administration.

[17] Mike Allen and Susan Schmidt, "Memo on Interrogation Tactics Is Disavowed: Justice Document Had Said Torture May Be Defensible," *WashingtonPost.com*, June 23, 2004 [online], http://www.washingtonpost.com/wp-dyn/articles/A60719-2004Jun22.html, p. A1; Matt Kelley, "Justice Dept. Repudiates Torture Memo Bush Reserved Specific Right to Ignore Geneva Conventions," *Charleston Gazette*, June 24, 2004, p. 1A.

[18] David Johnston and James Risen, "Aides Say Memo Backed Coercion for Qaeda Cases," *New York Times*, June 27, 2004.

[19] Dana Priest, "CIA Puts Harsh Tactics on Hold," *Washington Post*, June 27, 2004.

interrogation techniques, which would be prohibited in criminal cases, could compromise their agents in future criminal cases, the counterterrorism officials said."[20]

## High-Level "Ghost Detainees" in Prolonged Incommunicado Detention

As this report details, the CIA is holding a number of "ghost detainees" in prolonged incommunicado detention. The most sensitive and high-profile terrorism suspects have been detained by the United States in "undisclosed locations," presumably outside the United States, with no access to the ICRC, no notification to families, no oversight of any sort of their treatment, and in many cases no acknowledgement that they are even being held.

Human Rights Watch has pieced together below information on eleven such detainees who have "disappeared" in U.S. custody, though there may be more. They have been apprehended in places such as Pakistan, Indonesia, Thailand, Morocco, and the United Arab Emirates. Some were captured by the United States, and some were turned over to the United States by its allies. Almost all are allegedly leading members of al-Qaeda. Many are reported to have been tortured or mistreated in custody. Some are said to have provided valuable intelligence, some to have lied. The United States has acknowledged the detention of many, but not that of others. In each case, however, the United States has not only failed to register the detainees, but has also refused to disclose their fate or their whereabouts and thus removed them from the protection of the law for a prolonged period of time.

## Refusal to Disclose the Fate or Whereabouts of the Detainees

The United States government has consistently refused to provide information on the fate or the location of the detainees listed in this report. Human Rights Watch has made repeated requests for information on Hambali's location, legal status, and conditions of detention, for instance, none of which has been answered.[21]

The news media has had no more success, as evidenced by a report on ABC's *Nightline*: "As for the details of where they are being held, exactly how they are being treated, and

---

[20] James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004.

[21] Human Rights Watch, "In the Name of Security: Counterterrorism and Human Rights Abuses under Malaysia's Internal Security Act," May 2004 [online], http://www.hrw.org/reports/2004/malaysia0504/.

what the U.S. plans to do with them, that is all a secret. When asked why, an official from the CIA explained, that's a secret, too."[22]

The International Committee of the Red Cross has also repeatedly sought information on the detainees. In a March 2004 public statement, it noted:

> Beyond Bagram and Guantánamo Bay, the ICRC is increasingly concerned about the fate of an unknown number of people captured as part of the so-called global war on terror and held in undisclosed locations. For the ICRC, obtaining information on these detainees and access to them is an important humanitarian priority and a logical continuation of its current detention work in Bagram and Guantánamo Bay.[23]

In June, Erof Bosisio of the ICRC complained:

> We are more and more concerned about the lot of the unknown number of people captured in the context of what we would call 'the war against terror' and detained in secret places…We have asked for information on these people and access to them. Until now we have received no response from the Americans.[24]

According to the *New York Times*,

> the agency has refused to grant any independent observer or human rights group access to the high-level detainees, who have been held in strict secrecy. Their whereabouts are such closely guarded secrets that one official said he had been told that [President] Bush had informed the CIA that he did not want to know where they were.[25]

---

[22] John McWethy, *ABC News: Nightline*, May 13, 2004.

[23] International Committee of the Red Cross, "United States: ICRC President Urges Progress on Detention-Related Issues," Press Release, March 4, 2004 [online], http://www.icrc.org/Web/Eng/siteeng0.nsf/iwpList74/774F1B35A7E20CC9C1256E1D007741C1.

[24] "Rights Groups Raise Concerns over Secret U.S.-Run Prisons in Afghanistan," Agence France-Presse, June 19, 2004.

[25] James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004.

The United States has hindered other countries' efforts to bring alleged terrorists to justice by refusing to make the detainees available as witnesses in criminal cases, including the cases against Zacharias Moussaoui in the United States and Munir al-Mutasaddiq in Germany, the only people in custody charged in the 9/11 plot.[26] In February 2004, a German court absolved `Abd al-Ghani Mizudi, an alleged member of the Hamburg terror cell, of complicity in the September 11 attacks "not because the court is convinced you are innocent," but because the defendant could not "bear the burden of missing evidence" – the failure to produce Ramzi bin al-Shibh.[27]

The United States has even refused to allow the Indonesian government to question Hambali, an Indonesian citizen, causing a strain in the relationship between the two countries. It also denied the Indonesian government access to Omar al-Faruq, even though he was arrested in Indonesia by Indonesian authorities before being turned over to the United States. [28]

### Allegations of Mistreatment

International monitoring agencies have consistently stated that prolonged incommunicado detention itself is a form of prohibited mistreatment. The Inter-American Court on Human Rights has held that "prolonged isolation and deprivation of communication are *in themselves* cruel and inhuman treatment."[29] Likewise, the Human Rights Committee found "prolonged incommunicado detention in an unknown location" to be "torture and cruel, inhuman treatment."[30] The U.N. Commission on Human Rights has also noted "prolonged incommunicado detention … can *in itself* constitute a form of cruel, inhuman or degrading treatment."[31]

---

[26] See Joanne Mariner, "Witness Unavailable: How the U.S. Hinders Terrorism Prosecutions Abroad," *Findlaw*, March 17, 2004 [online], http://writ.news.findlaw.com/mariner/20040317.html.

[27] Ibid.

[28] Indonesia was finally allowed to give the United States questions to ask him.

[29] Inter-Am. Ct. H. R., Velasquez-Rodriguez case, Judgment of 29 July 1988, Series C, No. 4, para. 156. (Said judgment includes the following: "prolonged isolation and deprivation of communication are in themselves cruel and inhuman treatment, harmful to the psychological and moral integrity of the person and a violation of the right of any detainee to respect for his inherent dignity as a human being. Such treatment, therefore, violates Article 5 of the [American] Convention on Human Rights [prohibition against torture etc.].")

[30] El-Megreisi v. Libyan Arab Jamahiriya, *Communication No. 440/1990, U.N. Doc. CCPR/C/50/D/440/1990 (1994).*

[31] Resolution 2004/41, emphasis added. See also "ICCPR General Comment 20 (Forty-fourth Session, 1992): Article 7: Replaces General Comment 7 Concerning Prohibition of Torture and Cruel Treatment or Punishment," A/47/40 (1992) 193, para 6. ("prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7.").

Worse, secret detention is the gateway to physical torture. "Disappearances" almost always lead to mistreatment, and most often to summary executions. Given the secrecy surrounding "disappearances," it is difficult for outsiders to intervene to prevent these abuses. International bodies have repeatedly warned that holding detainees in prolonged incommunicado detention, with no judicial or ICRC oversight, is an open invitation to torture because of the removal of key safeguards against ill-treatment.

The former U.N. Special Rapporteur on Torture, Sir Nigel Rodley, has stated that "incommunicado detention is the most important determining factor as to whether an individual is at risk of torture."[32]

The U.N. Commission on Human Rights in 2004 "remind[ed] all States that prolonged incommunicado detention may facilitate the perpetration of torture and can in itself constitute a form of cruel, inhuman or degrading treatment or even torture, and urges all States to respect the safeguards concerning the liberty, security and the dignity of the person."

The current Rapporteur on Torture, Theo van Boven, has noted that "Incommunicado detention is aggravated when individuals are held in secret places of detention. ... the maintenance of secret places of detention should be abolished under law. It should be a punishable offence for any official to hold a person in a secret and/or unofficial place of detention."[33] The U.N. declaration on disappearances says that: "Any person deprived of liberty shall be held in an officially recognized place of detention."

Human Rights Watch has no first-hand information on the treatment of these detainees, but press accounts have repeatedly cited unnamed government officials acknowledging the torture or mistreatment of some of the detainees.

According to the *New York Times*, for instance, "C.I.A. interrogators used graduated levels of force [against Khalid Shaikh Muhammad], including a technique known as 'water boarding,' in which a prisoner is strapped down, forcibly pushed under water and

---

[32] Special Rapporteur Sir Nigel Rodley, "Report on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," (Geneva: United Nations, 1999), A/54/426, para. 42 (submitted in accordance with General Assembly resolution 53/139). ("As such, the Special Rapporteur reiterates the recommendation of his predecessor and urges all States to declare incommunicado detention illegal.")

[33] Special Rapporteur Theo Van Boven, "Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," (Geneva, United Nations, 2003), E/CN.4/2004/56.

made to believe he might drown."[34] (Muhammad's two young sons were also taken into custody and there have been reports that the CIA is holding them as an inducement to make him talk.[35]) It was also reported that U.S. officials initially withheld painkillers from Abu Zubayda, who was shot during his capture, as an interrogation device.[36] Tactics used by the CIA, according to the *Washington Post*, include "feigning suffocation, 'stress positions,' light and noise bombardment, sleep deprivation, and making captives think they are being interrogated by another government."[37]

Allegations of abuse against these "disappeared" detainees is rendered all the more credible by recent revelations of the widespread mistreatment of detainees at Iraq's Abu Ghraib prison and in other acknowledged U.S. detention centers in Afghanistan, Iraq and, to a lesser extent, Guantánamo Bay, Cuba. If abuses took place in these places, visited by the ICRC and subject, in theory at least, to various forms of oversight, it would not be surprising if abuse were also perpetrated against "ghost detainees" in secret detention centers where the recognized protections against mistreatment are not present.[38]

As a result of the Abu Ghraib scandal and related revelations, the CIA's then-Director George Tenet reportedly ordered an investigation in May 2004 into the CIA's interrogation tactics, and was reported to have scaled back some of its interrogation techniques.[39]

---

[34] James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004.

[35] See Olga Craig, "CIA Holds Young Sons of Captured al-Qaeda Chief," *The Sunday Telegraph*, March 9, 2003; Jess Bravin and Gary Fields, "How Do U.S. Interrogators Make a Captured Terrorist Talk?" *Wall Street Journal*, March 4, 2003; Amnesty International, "Pakistan: Open Letter to President Pervez Musharraf," AI Index 33/003/2004, Feb. 3, 2004

[36] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[37] Ibid.

[38] See, e.g., The International Committee of the Red Cross (ICRC), "The Treatment by the Coalition Forces of Prisoners of War and Other Protected Persons by the Geneva Conventions in Iraq during Arrest, Internment and Interrogation," [report], February 2004; see also Maj. Gen. Antonio M. Taguba, "Article 15-6 Investigation of the 800th Military Police Brigade," 2004 [online], http://www.npr.org/iraq/2004/prison_abuse_report.pdf.

[39] See, e.g., Douglas Jehl and David Johnston, "C.I.A. Expands Its Inquiry into Interrogation Tactics," *New York Times*, August 29, 2004; see also Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

### *Intelligence Collection*

United States officials are interrogating the "disappeared" detainees in secret locations to learn about al-Qaeda and to gather information to prevent future attacks. As the Pentagon's top lawyer, William J. Haynes II, said in a letter to Human Rights Watch (in which he eschewed the use of torture), "The United States questions enemy combatants to elicit information they may possess that could help the coalition win the war and forestall further terrorist attacks upon the citizens of the United States and other countries."[40]

According to government officials, a number of the detainees have provided important, life-saving, information, as detailed more fully below. Secretary of Defense Donald Rumsfeld said as early as September 2002 that interrogation of captured terrorist leaders had yielded "an awful lot of information" and had "made life an awful lot more difficult for an awful lot of folks."[41] Abu Zubayda's information, for instance, was said to lead to the apprehension of others in this report, including Ramzi Binalshibh, Omar Faruq and Rahim al-Nashiri. As a result of Omar Faruq's reported disclosures about preparations to attack American embassies in south-east Asia with explosives-laden trucks, the United States issued an alert and closed its embassies. Much of the report of the 9/11 Commission concerning the 9/11 plot is based on information provided by Khalid Shaikh Muhammad and Ramzi bin al-Shibh.

It is difficult to determine exactly what information has been provided by the detainees or to evaluate the U.S. government's claims about what the detainees have said. (The United States would have various reasons to suggest that al-Qaeda leaders are talking: destroying their mystique, persuading others to talk, justifying the harsh treatment.) More to the point, it is impossible to know whether more or less information, or information of greater accuracy, could have been gathered had the detainees been held and treated in accordance with the law. A number of doubts have been expressed regarding the accuracy of the accounts provided by the "disappeared" detainees.[42] It was noted, for example, that two key detainees, Khalid Shaikh Muhammad and Ramzi bin al-Shibh, "appear to have been willing to provide elaborate accounts of past events. But

---

[40] Letter from Department of Defense General Counsel William J. Haynes II to Kenneth Roth, Human Rights Watch, April 2, 2003 [online], http://www.hrw.org/press/2003/04/dodltr040203.pdf

[41] *PBS NewsHour*, September 16, 2002 [online], http://www.pbs.org/newshour/bb/terrorism/july-dec02/bkgdtracking_9-16.html.

[42] See, e.g., James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004, ("Many authorities contend that torture and coercive treatment is as likely to provide information that is unreliable as information that is helpful."); see also "Al Qaeda Captive Provides Leads in Terror Fight: U.S. Officials Concede Some Information May Be Suspect," *CNN.com*, June 12, 2002 [online]. http://www.cnn.com/2002/US/06/12/inv.zubaydah.tips/ ("Authorities concede much of what Zubaydah tells them might be false or deliberately vague").

they appeared to have been less willing to describe operations that have not yet been carried out, leading some of the intelligence officials to raise questions about the truthfulness of some or all of their statements."[43] An April 2003 CIA report on Khalid Shaikh Muhammad ["KSM"] that is cited in a footnote to the commission's report refers in its title to Muhammad's "Threat Reporting - Precious Truths, Surrounded by a Bodyguard of Lies," and concluded that "protecting operatives in the United States appeared to be a 'major part' of KSM's resistance efforts," noting his "less than satisfactory explanations" for U.S. zip codes in his notebooks.[44]

These doubts grew after one "ghost detainee," Ibn al-Shaikh al-Libi, a principal source for Bush administration claims that al-Qaeda collaborated with Saddam Hussein in the use of poison gas, recanted that assertion. (See section on al-Libi below.)

There is considerable evidence that information extracted by torture not as reliable as information drawn out of a witness by persuasive means. Indeed, after the Abu Ghraib scandal led to the curbing of a number of coercive practices used by interrogators on suspected Iraqi insurgents, the U.S. commander in charge of detentions and interrogations at Abu Ghraib said that the number of "high-value" intelligence reports drawn from interrogations of Iraqi prisoners had increased by more than half. Maj. Gen. Geoffrey Miller, who had previously run the detention center at Guantánamo Bay, Cuba, attributed the greater success to a system that encourages the establishment of a "rapport" between interrogator and detainee and bestows "respect and dignity" on the person being interrogated. Miller told reporters that, "In my opinion, a rapport-based interrogation that recognizes respect and dignity, and having very well-trained interrogators, is the basis by which you develop intelligence rapidly and increase the validity of that intelligence."[45]

The National Commission on Terrorist Attacks upon the United States (the "9/11 Commission") used detainee accounts in its telling of the story of the September 11 attacks. This is what it said about those accounts and their credibility:

> Chapters 5 and 7 [regarding the 9/11 plot] rely heavily on information obtained from captured al-Qaeda members. A number of these

---

[43] David Johnston and Don Van Natta, Jr., "Account of Plot Sets off Debate over Credibility," *New York Times*, June 17, 2004.

[44] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 514, n. 4

[45] Dexter Filkins, "General Says Less Coercion of Captives Yields Better Data," *New York Times*, September 7, 2004; See also Babak Dehghanpisheh, "The Last Word: Geoffrey Miller," *Newsweek International*, Sept. 27, 2003.

"detainees" have firsthand knowledge of the 9/11 plot. Assessing the truth of statements by these witnesses—sworn enemies of the United States—is challenging. Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when, or how questions of particular interest would be asked. Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting. We were told that our requests might disrupt the sensitive interrogation process.

We have nonetheless decided to include information from captured 9/11 conspirators and al-Qaeda members in our report. We have evaluated their statements carefully and have attempted to corroborate them with documents and statements of others. In this report, we indicate where such statements provide the foundation for our narrative. We have been authorized to identify by name only ten detainees whose custody has been confirmed officially by the U.S. government.[46]

(For each of the eleven detainees profiled below, we state whether their detention has was listed as "confirmed officially by the U.S. government" by the 9/11 Commission.)

The 9/11 Commission reportedly "tried to find out about the treatment of the prisoners but could not."[47] It is disappointing that an official inquiry established by the United States Congress had nothing more to say about the U.S.'s use of prolonged incommunicado detention and about the possibility that these detainees were tortured in U.S. custody.

One 9/11 commissioner, Fred F. Fielding, asked how trustworthy Khalid Shaikh Muhammad's information was. "Our concern is that while there's some that can be verified, there are other areas where it certainly could be a source of disinformation for whatever reason."[48] The Commission's director noted that "some of this material has

---

[46] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 146.

[47] Elizabeth Drew, "Pinning the Blame," *New York Review of Books*, September 23, 2004. ("Philip Zelikow, the staff director, told me that the staff tried to find out about the treatment of the prisoners but could not.")

[48] National Commission on Terrorist Attacks Upon the United States, Twelfth Public Hearing, June 16, 2004 [online], http://www.9-11commission.gov/archive/hearing12/9-11Commission_Hearing_2004-06-16.htm; David

been inconsistent."[49] The 9/11 Commission noted areas in which the detainees' accounts contradict each other or in which the Commission disbelieved what the detainees told interrogators. For example, it doubted the statement by Khalid Shaikh Muhammad that al-Qaeda had no agents in California to help two of the future hijackers. "We do not credit this denial," the commission said.[50] It found that Ramzi bin al-Shibh "has sought, somewhat incredibly," to exculpate a host of individuals, from complicity in the 9/11 plot.[51] Again, it is impossible to say whether better information would have been obtained using more traditional, and legal, interrogation methods.

## IV. "Disappearances" in Law and History

"Disappearances" have come to be regarded as a quintessential evil practiced by abusive governments. The method seems to have been invented by Adolf Hitler in his *Nacht und Nebel Erlass* (Night and Fog Decree) of December 7, 1941. The purpose of this decree was to seize persons in occupied territories "endangering German security" who were not immediately executed and to transport them secretly to Germany, where they disappeared without trace. German authorities prohibited officials from giving any information in order to achieve the desired intimidating effect.[52]

"Disappearances" were practiced on a large scale in Latin American by regimes supported by the United States. The tactic was in part a response to the success of the human rights movement in shaming governments for other human rights abuses, such as torture—and in mobilizing U.S. public opinion against the imprisonment and killing of peaceful dissenters by client states. By keeping violations out of sight, governments made the abuses harder to trace and to condemn, and were thus able to avoid scrutiny and accountability.

---

Johnston and Don Van Natta, Jr., "Account of Plot Sets off Debate over Credibility," *New York Times*, June 17, 2004.

[49] Philip Zelikow, National Commission on Terrorist Attacks Upon the United States, Twelfth Public Hearing, June 16, 2004 [online], http://www.9-11commission.gov/archive/hearing12/9-11Commission_Hearing_2004-06-16.htm. ("Much of the account [of the 9/11 plot] in this statement reflects assertions reportedly made by various 9/11 conspirators, and captured al Qaeda members while under interrogation. We have sought to corroborate this material as much as possible. Some of this material has been inconsistent.")

[50] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 215.

[51] Ibid., p. 531, n. 162.

[52] Report submitted by Mr. Manfred Nowak, independent expert charged with examining the existing international criminal and human rights framework for the protection of persons from enforced or involuntary disappearances, E/CN.4/2002/71, January 8, 2002.

In the late 1960s, the Guatemalan security forces began to use forced disappearances—secretly arresting, torturing, and killing its opponents—as part of its counter-insurgency campaign. In the 1970s and 1980s, military regimes throughout Latin America, including Chile, El Salvador, Honduras, Colombia, and Nicaragua, engaged in forced disappearances.

When discovered, the Latin American dictatorships sought to justify their abuses by invoking the threat posed by leftists and "terrorists." During the transition to democracy in Argentina, for instance, the military published a "Final Document on the Struggle Against Subversion and Terrorism," which purported to provide a legitimate explanation for the "disappearances."

The practice has spread far from its roots, however. Iraq and Sri Lanka are the countries with the most cases of "disappearances" between 1980 and 2003.[53] In Algeria, thousands of persons were "disappeared" during the civil strife of the 1990s and remain unaccounted for.[54]

Under international law, forced disappearances (or enforced disappearances), as they are officially called, are considered one of the most serious violations of the fundamental rights of human beings, as well as an "offence to human dignity"[55] and "a grave and abominable offense against the inherent dignity of the human being."[56] The United Nations General Assembly has said that forced disappearance "constitutes an offence to human dignity, a grave and flagrant violation of human rights and fundamental freedoms [...] and a violation of the rules of international law."[57] Pursuant to the Rome Statute of the International Criminal Court, the systematic or massive practice of "disappearances" can constitute a crime against humanity. [58]

---

[53] See "Report of the Working Group on Enforced or Involuntary Disappearances" (Geneva: United Nations, 1998), E/CN.4/2004/58.

[54] Human Rights Watch, "Truth and Justice on Hold: The New State Commission on 'Disappearances,'" December 2003, [online] http://www.hrw.org/reports/2003/algeria1203/

[55] United Nations General Assembly, "Declaration on the Protection of All Persons from Enforced Disappearances" (Geneva: United Nations, 1992), A/RES/47/133, art. 1.

[56] Organization of American States, "Inter-American Convention on Forced Disappearance of Persons," 2003, Preamble, para. 3.

[57] U.N. General Assembly, "Question of Enforced or Involuntary Disappearances" (New York: United Nations, 1994), A/RES/49/193. See also U.N. General Assembly, "Question of Enforced or Involuntary Disappearances" (New York: United Nations, 1996), A/RES/51/94, and U.N. General Assembly, "Enforced or Involuntary Disappearances" (New York: United Nations, 1998), A/RES/53/150.

[58] Art. 7(2)(1).

"Disappeared" detainees are cut off from the outside world, deprived of any legal protection, and subject to the whim of their captors. One element that characterizes and is specific to forced disappearance is that it removes the individual from the protection of the law.[59] This characteristic has the effect of suspending enjoyment of all of the rights of the "disappeared" person and placing the victim in a situation of complete defenselessness.[60]

Most often around the world, "disappeared" prisoners have been tortured and then secretly killed. However there are many instances of "disappearances" in which detainees were not killed and indeed ultimately "reappeared." In Morocco, for instance, hundreds of suspected government opponents of Moroccan and Western Saharan origin "disappeared" beginning in the 1960s. They were held in "villas in residential areas, secret police facilities, isolated farms, former military camps or barracks, and ancient fortresses."[61] Many had been held in the remote barracks of Tazmamart, a detention center whose very existence had been denied by the authorities. In 1991, after international outrage crested, more than 300 such prisoners were released, some after being held in secret detention up to nineteen years. In Argentina, the Inter-American Commission on Human Rights was able to locate "disappeared" prisoners during a 1979 on-site visit.[62]

### *The Definition of "Forced Disappearances" in International Law*

"Forced Disappearance" has been defined in several recent international instruments.[63]

According to the Declaration on the Protection of all Persons from Enforced Disappearance, adopted by the U.N. General Assembly in 1992, enforced disappearances occur when

---

[59] See, e.g., United Nations General Assembly "Declaration on the Protection of All Persons from Enforced Disappearances," preamble, para. 3. Also see Organization of American States, "The Inter-American Convention on Forced Disappearance of Persons," art. 2, and see The Rome Statute of the International Criminal Court, art. 7(2)(i).

[60] Federico Andreu-Guzmán, "The Draft International Convention on the Protection of All Persons from Forced Disappearance," International Commission of Jurists.

[61] See Amnesty International, "'Disappearances' and Political Killings: A Manual for Action," 1994, p. 68.

[62] See Thomas Buergenthal, Robert Norris, and Dinah Shelton, *Protecting Human Rights in the Americas: Selected Problems* (Kehl am Rhein: Engel, 1986), pp. 179-181.

[63] See "Report Submitted by Mr. Manfred Nowak, Independent Expert Charged with Examining the Existing International Criminal and Human Rights Framework for the Protection of Persons from Enforced or Involuntary Disappearances, pursuant to Paragraph 11 of Commission Resolution 2001/46," (Geneva: United Nations, 2002) E/CN.4/2002/71; Reed Brody and Felipe Gonzalez, "Nunca Más: An Analysis of International Instruments on 'Disappearances,'" *Human Rights Quarterly*, vol. 19, no. 2, May 1997.

18

persons are arrested, detained or abducted against their will or otherwise deprived of their liberty by officials of different branches or levels of Government, ... followed by a refusal to disclose the fate or whereabouts of the persons concerned or a refusal to acknowledge the deprivation of their liberty, which places such persons outside the protection of the law...[64]

The Inter-American Convention on Forced Disappearance of Persons adopted in 1994[65] defines forced disappearance of persons as

the act of depriving a person or persons of his or her freedom, in whatever way, perpetrated by agents of the state or by persons or groups of persons acting with the authorization, support, or acquiescence of the state, followed by an absence of information or a refusal to acknowledge that deprivation of freedom or to give information on the whereabouts of that person, thereby impeding his or her recourse to the applicable legal remedies and procedural guarantees.[66]

"Enforced disappearance," the systematic practice of which can be a crime against humanity, was defined by the Rome Statute of the International Criminal Court as the

arrest, detention or abduction of persons by, or with the authorization, support or acquiescence of, a State or a political organization, followed by a refusal to acknowledge that deprivation of freedom or to give information on the fate or whereabouts of those persons, with the intention of removing them from the protection of the law for a prolonged period of time. [67]

Each of these definitions involves four elements

    (a)    Deprivation of liberty against the will of the detainee;

---

[64] U.N. General Assembly, "Declaration on the Protection of All Persons from Enforced Disappearance," (New York: United Nations, 1992), A/RES/47/133.

[65] The United States has not signed or ratified this treaty.

[66] Convention, art. 2.

[67] Art. 7(2)(1).

Case 1:05-cv-01013-JDB    Document 16-19    Filed 01/24/2006    Page 22 of 46

(b)     Direct or indirect involvement of government officials;

(c)     Refusal to acknowledge the detention **or** to disclose the fate and whereabouts of the person concerned; and

(d)     The removal of the detainee from the protection of the law.

United States courts have said that the tort of "disappearance" "is characterized by the following two essential elements: (1) abduction by state officials or their agents; followed by (2) official refusals to acknowledge the abduction or to disclose the detainee's fate."[68]

The cases described in this report fit the definition of forced disappearances because the United States has detained these people and refused in each case either to acknowledge the detention or to give information on the fate or the whereabouts of these detainees, precisely for the purpose of removing them from the protection of the law.

### The Absolute Ban on "Disappearances"

"Disappearances" are banned in all situations. According to the Declaration on the Protection of All Persons from Enforced Disappearance, "No circumstances whatsoever, whether a threat of war, a state of war . . . may be invoked to justify enforced disappearances."

The International Committee of the Red Cross (ICRC) has said

> No matter how legitimate the reasons for a person's detention, no one has the right to keep that person's fate or whereabouts secret or to deny that he or she is being detained. This practice runs counter to the basic tenets of international humanitarian law and human rights law. [69]

### Legal Prohibitions on Incommunicado Detention

International law also bars incommunicado detention, even when it does not constitute "disappearance." The authoritative Restatement (Third) of Foreign Relations Law of the United States lists categories of acts that violate customary international law. Section

---

[68] *Forti v. Suarez-Mason*, 694 F. Supp. 707, 711 (N.D.Cal. 1988)

[69] International Committee of the Red Cross, "Enforced Disappearance Must Stop," August 30, 2003 [online], http://www.icrc.org/Web/Eng/siteeng0.nsf/iwpList581/8AE1907FEC3D5CA0C1256D92005202B3

702 (Customary International Law of Human Rights) provides that a state violates international law if, as a matter of state policy, it practices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) *prolonged arbitrary detention*, (f) systematic racial discrimination, or (g) a consistent pattern of gross violations of internationally recognized human rights.[70]

Under the International Covenant on Civil and Political Rights (ICCPR), which the United States has ratified, all prisoners are to be treated "with humanity and with respect for the inherent dignity of the human person."[71] States have a duty to take effective action to minimize the risk of torture. The elected Human Rights Committee, which monitors the ICCPR, has stated:

> To guarantee the effective protection of detained persons, provisions should be made for detainees to be held in places officially recognized as places of detention and for their names and places of detention, as well as for the names of persons responsible for their detention, to be kept in registers readily available and accessible to those concerned, including relatives and friends. To the same effect, the time and place of all interrogations should be recorded, together with the names of all those present and this information should also be available for purposes of judicial or administrative proceedings. Provisions should also be made against *incommunicado* detention.[72]

The Third Geneva Convention in article 126 (concerning prisoners of war) and the Fourth Geneva Convention in article 143 (concerning detained civilians) requires the ICRC to have access to all detainees and places of detention. Visits may only be prohibited for "reasons of imperative military necessity" and then only as "an exceptional and temporary measure." These provisions also require that prisoners be documented, and that their whereabouts be made available to their family and governments.

It is also not clear what U.S. law allows officials to hold these suspects in prolonged incommunicado detention. In June 2004, the U.S. Supreme Court ruled that the

---

[70] The Restatement, prepared by the American Law Institute, is generally considered to be an authoritative statement of the law of the United States.

[71] ICCPR, art. 10 (1).

[72] "ICCPR General Comment 20 (Forty-fourth Session, 1992): Article 7: Replaces General Comment 7 Concerning Prohibition of Torture and Cruel Treatment or Punishment," A/47/40 (1992) 193, para. 11.

Authorization for Use of Military Force Act, which Congress passed after September 11 authorizing the President to pursue al-Qaeda and its supporters, gave him the power to detain enemy forces captured in battle. Speaking for the plurality of the Court, however, Justice Sandra Day O'Connor said, "Certainly, we agree that indefinite detention for the purposes of interrogation is not authorized."[73] United States law considers both "prolonged detention without charges and trial," and "causing the disappearance of persons by the abduction and clandestine detention of those persons" to constitute "gross violations of internationally recognized human rights."[74]

## V. Recommendations to the United States Government:

- Publicly announce and demonstrate its opposition to "disappearances" by:

  o Making clear that "disappearances" will not be tolerated under any circumstances.

  o Holding criminally responsible officials who order or tolerate "disappearances" by those under their command.

- Bring all detainees under the full protection of the law. While the situation of detainees may differ, all should be afforded the fundamental guarantees provided for under international law. Restrictions on their rights which may be justified by emergency situations that threaten the life of the nation, such as restrictions on the right to counsel and the right to a fair trial, should be limited in time and subject to periodic judicial supervision; the need for any such restrictions should be periodically revisited with a view to incrementally allowing detainees to enjoy more rights.

- Hold detainees only in officially recognized places of detention. The names of detainees and their places of detention, including transfers, as well as the names of persons responsible for their detention, should be kept in registers readily available and accessible to those concerned.

---

[73] *Hamdi, et al. v. Rumsfeld, Secretary of Defense, et al.*, U.S. Court of Appeals, 4th Circuit, 73 22 U.S.C. 2304 (d)(1),
No. 03-6696, Decided: June 2004, p. 13.

- Grant unrestricted access to the International Committee of the Red Cross to all detainees held pursuant to anti-terrorist operations.

- Ensure that all detentions anywhere in the world that result from anti-terrorist operations are subject to periodic judicial oversight or to the protections of the Geneva Conventions.

- Take the necessary legislative steps to ensure that the commission of a "disappearance" constitutes a criminal offense, punishable by sanctions commensurate with the gravity of the practice.

- Allow an impartial and independent investigation into allegations of torture and mistreatment, and of clandestine, for all persons deprived of their liberty in U.S. custody. The investigation should be empowered to recommend the creation of a special prosecutor to probe possible criminal offenses. The investigation should examine, among other things, the link between administration policy discussions and memos and actual practices in U.S. places of detention.

## VI. Acknowledgements

This report was written by Reed Brody, special counsel with Human Rights Watch. Additional research assistance was provided by interns Reyko Huang and Pauline Busson, and by Joanne Mariner, deputy director of the Americas division. Joe Saunders, deputy program director, edited the report; Wilder Tayler, legal and policy director, provided a legal review. Rania Suidan, associate, prepared the report for publication. Andrea Holley, publications director for Human Rights Watch, and Fitzroy Hepkins, mail manager, made possible the production of this report.

Human Rights Watch would also like to thank the Open Society Institute, the Overbrook Foundation, F. & J.S. Fund, The New York Community Trust, and Vanguard Charitable Endowment, as well as a group of generous individuals who made this work possible, including Franz Allina, Felice Shea, Marcia Allina, Lloyd Morrisett, Wendy Mackenzie, Victor Navasky, Paula Oppenheim, Richard Sutton, and Richard Lane.

## VII. Annex: Eleven Detainees in Undisclosed Locations

### 1. *Ibn al-Shaikh al-Libi (Libya)*

Detention not "confirmed" by the U.S. government.[75]

#### Background
Listed among the most wanted al-Qaeda leaders whose assets were frozen by President Bush. Al-Libi allegedly led the training camp at al-Khaldan, one of al-Qaeda's largest camps,[76] and worked under Abu Zubayda.

#### Arrest
Arrested in late December 2001 or early January 2002 by Pakistani authorities after fleeing the fighting in the Tora Bora mountains of Afghanistan.

#### Detention
Al-Libi was reportedly in U.S. custody at the airport in Kandahar, Afghanistan soon after his arrest.[77] According to U.S. officials, he was then interrogated by U.S. officials aboard the USS Bataan, an amphibious assault ship in the Arabian Sea, where American John Walker Lindh and other detainees were being held.[78] *Newsweek* reported a clash between the FBI and the CIA after al-Libi's arrest:

FBI officials brought their plea to retain control over al-Libi's interrogation up to FBI Director Robert Mueller. The CIA station chief in Afghanistan, meanwhile, appealed to the agency's hawkish counterterrorism chief, Cofer Black. He in turn called CIA Director George Tenet, who went to the White House. Al-Libi was handed over to the CIA. "They duct-taped his mouth, cinched him up and sent him to Cairo" for more-fearsome Egyptian interrogations, says the ex-FBI official. "At the airport the CIA case officer goes up to him and says, 'You're going to Cairo, you know. Before you get there

---

[75] As per 9/11 Commission. See *National Commission on Terrorist Attacks Upon the United States*, p. 488, n. 2

[76] Eric Schmitt and Erik Eckholm, "The Hunted: U.S. Takes Custody of a Qaeda Trainer Seized by Pakistan," *New York Times*, January 6, 2002.

[77] "Ibn al-Shaikh al-Libi Is in U.S. Custody," *CNN.com Transcripts*, January 5, 2002 [online], http://cnnstudentnews.cnn.com/TRANSCRIPTS/0201/05/smn.06.html.

[78] "Myers: Intelligence Might Have Thwarted Attacks: Senior Taliban Fighters Taken into Custody," *CNN.com*, January 9, 2002 [online], http://www.cnn.com/2002/WORLD/asiapcf/central/01/08/ret.afghan.attacks/.

I'm going to find your mother and I'm going to f--- her.' So we lost that fight." (A CIA official said he had no comment.)[79]

The *Washington Post* likewise reported that the capture of al-Libi generated the first real fight over interrogations of the secret detainees: the CIA wanted to threaten his life and family; the FBI objected.[80]

### Intelligence

Al-Libi reportedly provided the CIA with information about an alleged plot to blow up the U.S. Embassy in Yemen with a truck bomb.[81] Al-Libi was also a principal source for Bush administration claims that al-Qaeda collaborated with Saddam Hussein, particularly the assertion by Secretary of State Colin Powell to the United Nations that Iraq had provided training in "poisons and deadly gases" for al-Qaeda.[82] According to *Newsweek*, however, al-Libi recanted after being confronted with the testimony of other detainees: "Some officials now suspect that al-Libi, facing aggressive interrogation techniques, had previously said what U.S. officials wanted to hear."[83]

## 2. Abu Zubayda, a.k.a. Zubeida, Zain al-`Abidin Muhammad Husain, `Abd al-Hadi al-Wahab (Palestinian)

Detention "confirmed" by the U.S. government.[84]

### Background

Allegedly senior al-Qaeda operational planner, potential heir to bin Laden. Zubayda is said by U.S. officials to have organized several attacks on U.S. interests, including the failed "millennium plot" to bomb the Los Angeles International Airport and a hotel in Jordan frequented by American tourists. He reportedly has strong ties with Jordanian

---

[79] Michael Hirsh, John Barry, and Daniel Klaidman, "A Tortured Debate," *Newsweek*, June 21, 2004.

[80] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[81] Ibid.

[82] Stephen F. Hayes, "Case Closed: The U.S. Government's Secret Memo Detailing Cooperation between Saddam Hussein and Osama bin Laden," *The Weekly Standard*, November 24, 2003.

[83] Michael Isikoff, "Iraq and al Qaeda: Forget the 'Poisons and Deadly Gases,'" *Newsweek*, July 5, 2004. See also Douglas Jehl, "High Qaeda Aide Retracted Claim of Link with Iraq," *New York Times*, July 31, 2004. ("Intelligence officials… said they would not speculate as to whether he might have been seeking to deceive his interrogators or to please them by telling them what he thought they wanted to hear.")

84 As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

and Palestinian groups and was sentenced to death in absentia by a Jordanian court for his role in the millennium plot.[85] He is also believed to have played a role in plots to blow up U.S. embassies in Sarajevo and Paris in the fall of 2001, as well as in the Sept. 11 attacks. Zubayda worked in Pakistan and coordinated al-Qaeda volunteers traveling to Afghanistan, sending individuals to training camps and assigning them to cells overseas once they completed trainings.[86] After the fall of the Taliban in late 2001, Zubayda reportedly led an effort to rebuild al-Qaeda in Pakistan. He is said to have been commanding an al-Qaeda faction that was planning new attacks against American interests, according to U.S. officials. He was third on the U.S. list of wanted al-Qaeda suspects, after Osama bin Laden and his deputy, Ayman al-Zawahri.

**Arrest**

Arrested in March 2002 in Faisalabad, Pakistan. He was said to be seriously injured in a shootout with the Pakistani and American forces that captured him in a Pakistan safehouse in March 2002.

**Detention**

Zubayda was reportedly in U.S. custody in Pakistan[87] under CIA control, as of June 2002.[88]

According to *Time* magazine, a "well-placed American military official" said that the U.S. had initially looked for an ally to conduct an interrogation. "Someone is going to squeeze him…We've been out of that business for so long that it's best handled by others. …It's not pulling out fingernails, but it's pretty brutal."[89] However, confirming his capture on April 3, 2002, Defense Secretary Donald H. Rumsfeld said, "We have him. He is under U.S. control at the present time. We are responsible for him…. He is receiving medical care, and we intend to get every single thing out of him to try to prevent terrorist acts in the future."[90] Both the *Washington Post* and the *New York Times*, however, reported that

---

[85] "Profile: Abu Zubaydah," *BBC News Online*, April 2, 2002 [online], http://news.bbc.co.uk/1/hi/world/south_asia/1907462.stm.

[86] "Prisoner May Be bin Laden's Top Deputy," Associated Press, April 2, 2002.

[87] Daniel McGrory, "'Bear' May Lead to bin Laden," *The Times*, June 20, 2002.

[88] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[89] Jodie Morse, "How Do We Make Him Talk?" *Time*, April 6, 2002.

[90] Linda D. Kozaryn, "Al Qaeda Leader Zubaydah to Remain in U.S. Control," American Forces Press Service, April 3, 2002.

U.S. officials initially withheld painkillers from Zubayda, who was shot during his capture, as an interrogation device.[91]

When Zubayda was captured, the debate between the CIA and FBI over interrogation tactics reportedly re-heated (after the al-Libi case, above). This time, FBI Director Robert S. Mueller III reportedly decided to hold back FBI involvement. "Once the CIA was given the green light . . . they had the lead role," a senior FBI counterterrorism official told the *Washington Post*.[92]

### Intelligence

U.S. officials say that Zubayda has provided intelligence on al-Qaeda's efforts to build a "dirty bomb" and that his information helped lead to the arrest of Jose Padilla, the American allegedly plotting to use such a weapon in the United States. U.S. intelligence and national security officials told the *Washington Post* that Zubayda's information led to the apprehension of other al-Qaeda members, including Ramzi Binalshibh, Omar Faruq, Rahim al-Nashiri, and Muhammad al-Darbi.[93] All four remain under CIA control. The 9/11 Commission report refers to the intelligence reports of seven interrogation sessions with Zubayda, dating from February 2002 to April 2004.

## 3. Omar al-Faruq (Kuwait)

Detention not "confirmed" by the U.S. government.[94]

### Background

Faruq is said to be a key link between al-Qaeda and other militant Islamic groups in Southeast Asia, especially the Jemaah Islamiyah.[95] According to *Time* magazine, quoting a CIA report, Faruq was a senior al-Qaeda operative co-ordinating Islamic militants in Southeast Asia and had admitted to being the mastermind behind a number of attacks on Indonesian churches on Christmas 2000, which killed eighteen people and injured

---

[91] Raymond Bonner, Don Van Natta, Jr., and Amy Waldman, "Questioning Terror Suspects in a Dark and Surreal World," *New York Times*, March 9, 2003; Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[92] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[93] Ibid.

[94] As per 9/11 Commission. See *National Commission on Terrorist Attacks Upon the United States*, p. 488, n. 2.

[95] "Who's Who in al-Qaeda," *BBC News Online*, July 15, 2004 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2780525.stm#ic.

one hundred. According to the BBC, Faruq was al-Qaeda's most senior representative in the region.[96] Faruq was said to have admitted planning a series of bomb attacks targeting U.S. embassies in Southeast Asia timed to coincide with the anniversary of the September 11 attacks.[97]

**Arrest**

Arrested in June 5, 2002 in Indonesia by Indonesian authorities.[98]

**Detention**

He is said to be in U.S. custody[99] under CIA control.[100] Upon his arrest in Indonesia in June 2002, Faruq was reportedly hooded and flown to Bagram airforce base, Afghanistan, on a CIA aircraft for questioning. When his hood was removed in Bagram, the seals of the New York City Police and Fire Departments were reportedly on the wall in front of him. After three months of interrogation, he reportedly told interrogators that he was a senior al-Qaeda representative in Southeast Asia, reporting to Abu Zubayda.[101] According to the *New York Times*:

What is known is that the questioning was prolonged, extending day and night for weeks. It is likely, experts say, that the proceedings followed a pattern, with Mr. Faruq left naked most of the time, his hands and feet bound. … Mr. Faruq may also have been hooked up to sensors, then asked questions to which interrogators knew the answers, so they could gauge his truthfulness, officials said. The Western intelligence official described Mr. Faruq's interrogation as "not quite torture, but about as close as you can get." The official said that over a three-month period, the suspect was fed very little, while being subjected to sleep and light deprivation, prolonged isolation and room temperatures that varied from 100 degrees to 10 degrees.[102]

---

[96] "Asia Moves against al-Qaeda," *BBC News Online*, September 17, 2002 [online]. http://news.bbc.co.uk/1/hi/world/asia-pacific/2264170.stm.

[97] Romesh Ratnesar, Jason Tedjasukmana, Simon Elegant, Zamira Loebis, Nelly Sindayen, Elaine Shannon, and Douglas Waller, "Confessions of an Al-Qaeda Terrorist," *Time Magazine*, September 23, 2002.

[98] "Asia Moves against al-Qaeda," *BBC News Online*; "SE Asia moves against terror," *BBC News Online*, September 18, 2002 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/2266467.stm.

[99] "Profile: Abu Bakar Ba'asyir," *BBC News Online*, April 29, 2004 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/2339693.stm.

[100] Dana Priest, "CIA Puts Harsh Tactics on Hold," *Washington Post*, June 27, 2004.

[101] Raymond Bonner, "Singapore Announces Arrests of 21 Men Linked to Planned Attacks on U.S. Targets," *New York Times*, September 17, 2002.

[102] Raymond Bonner, Don Van Natta, Jr., and Amy Waldman, "Threats and Responses: Interrogations; Questioning Terror Suspects in a Dark and Surreal World," *New York Times*, March 9, 2003.

Although Indonesia had turned Faruq over to the United States, the United States would not allow Indonesian authorities to interrogate Faruq, angering some Indonesian officials. They were allowed to submit questions, which the Americans then asked.[103]

### Intelligence

According to U.S. officials cited by the BBC, Faruq "at first said very little, but then in early September he broke down."[104] Faruq reportedly told his interrogators of preparations to attack American embassies in Indonesia, Malaysia, the Philippines, Singapore, and Cambodia with explosives-laden trucks.[105] As a result of Faruq's disclosures, the United States issued an alert and closed its embassies.[106] Faruq's questioning also provided evidence against the radical Islamic cleric Abu Bakar Bashir, who was convicted on charges of violence by an Indonesian court. According to his U.S. interrogators, he is said to have given details of Jemaah Islamiyah's ties to al-Qaeda.[107]

## 4. Abu Zubair al-Haili, a.k.a. Fawzi Saad al-`Obaydi (Saudi Arabia)

Detention not "confirmed" by the U.S. government.[108]

### Background

Allegedly ran al-Qaeda training camps in Afghanistan. Zubair is said to have played a major role in bringing recruits to training camps in Afghanistan prior to September 11. He was deputy to or associate of Abu Zubayda.[109] He is said to have aided al-Qaeda members flee from Afghanistan after the fall of the Taliban. According to the Moroccan Justice Ministry, he was one of three Saudi men arrested while plotting to attack warships in the Strait of Gibraltar.[110] His trainees are believed to include Zacarias

---

[103] Raymond Bonner, "Islamic Cleric Gets Mixed Verdict in Indonesian Trial for Terrorism," *New York Times*, September 3, 2003.

[104] "Indonesia Probes al-Qaeda Links," *BBC News Online*, October 17, 2002 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/2336363.stm.

[105] Raymond Bonner, "Singapore Announces Arrests of 21 Men Linked to Planned Attacks on U.S. Targets," *New York Times*, September 17, 2002.

[106] Romesh Ratnesar, et al., "Confessions of an Al-Qaeda Terrorist," *Time Magazine*, September 23, 2002, cover story.

[107] "How Terror Came to Bali," *BBC News Online*, December 23, 2002 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/2579007.stm.

[108] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[109] Matthew Engel, "U.S. Tastes Success with Arrest of Senior al-Qaeda Suspects," The Guardian, June 20, 2002.

[110] Andrew Buncombe, "Terror Suspect in Morocco Holds Key to al-Qaida," *The Independent*, June 20, 2002.

Moussaoui, the alleged 9/11 conspirator, and Richard Reid, the alleged "shoe bomber."[111]

The British *Sunday Telegraph*, basing its information on a British government dossier on Iraq, said that Abu Zubair, at the time linked to Saddam Hussein, was trained in Iraq. This report also said that in the 1990s, Zubair's "Supporters of Islam" organisation was sent by Saddam Hussein into northern Iraq to "assassinate leading Kurds and to build chemical warfare facilities." Zubair is then said to have defected from Saddam Hussein to al-Qaeda.[112]

**Arrest**

Arrested in June 2002 in Morocco by Moroccan authorities.[113]

**Detention**

When Zubair was apprehended, U.S. officials reportedly said that they were in no hurry to take custody of Abu Zubair because the Moroccans "can use much more persuasive methods in questioning a suspect."[114] In August 2002, U.S. sources were "unwilling to say where al-Haili is being held or by whom." [115] He is said to be in U.S. custody now, however. [116]

**Intelligence**

Because Zubair reportedly helped al-Qaeda operatives flee Afghanistan, it was hoped that he would know the false names and identities that some of them had assumed.[117]

[111] Daniel McGrory, "'Bear' May Lead to bin Laden," *The Times*, June 20, 2002.

[112] David Bamber and Caroline Overington, "Saddam Trained bin Laden Aides, British Claim," *The Sunday Telegraph*, September 16 2002; William Safire, "Interrogations Link al Qaeda to Iraq," *The New York Times*, August 24, 2002.

[113] "West Awaits Return of bin Laden," *BBC News Online*, June 24, 2002 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2062737.stm.

[114] "Morocco Holds 'al-Qaeda Recruiter,'" *BBC News Online*, June 19, 2002 [online], http://news.bbc.co.uk/1/hi/world/africa/2053187.stm, quoting *ABC News*.

[115] "Officials: 200 in U.S. under 'Constant' Surveillance," *CNN.com*, August 30, 2002.

[116] See, e.g., Andrew Buncombe, "The War on Terror: Worldwide Search – Al Qa'ida Still a Threat Despite Loss of Key Men," *Independent on Sunday*, September 15, 2002.

[117] "Senior al Qaeda Figure in Custody Today in Morocco," *CNN*, June 19, 2002 [online], http://www.cnn.com/TRANSCRIPTS/0206/19/lt.12.html.

### 5. Ramzi bin al-Shibh (Yemen)

Detention "confirmed" by the U.S. government.[118]

**Background**

Alleged conspirator in Sept. 11 attacks. He failed four times to get a U.S. visa.[119] Bin al-Shibh is said to have become a key member of the al-Qaeda cell in Hamburg, Germany after he sought asylum there in the late 1990s. He reportedly met Muhammad Atta, the leader of the Hamburg cell, through a local mosque in 1997. Intelligence officials say bin al-Shibh may also have been involved in the attacks on the USS Cole and a Tunisian synagogue.[120]

**Arrest**

Arrested in September 2002 in Karachi, Pakistan.

**Detention**

After his arrest, the Pakistani government handed him over to the United States,[121] which reportedly took him initially to a secret CIA installation in Thailand.[122] He has since been kept in custody in an undisclosed location under CIA control.[123] The United States district court trying Zacarias Moussaoui, charged with conspiracy in the 9/11 attacks, decided in April 2004 to allow Moussaoui to take testimony from bin al-Shibh and two other al-Qaeda members. The United States had refused, citing national security concerns.[124] In September 2004, a U.S. appeals court reportedly said that Moussaoui could submit written questions intended for the detainees.[125] In the trial of Munir al-

---

[118] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[119] "Sept. 11 Coordinator at Gitmo, Paper Says," *The Commercial Appeal*, March 1, 2004.

[120] "Who's Who in al Qaeda," *BBC News Online*, July 15, 2004 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2780525.stm#ic.

[121] "U.S. Secrets Suspects out of Pakistan," *The Australian*, September 18, 2002.

[122] Raymond Bonner, Don Van Natta, Jr., and Amy Waldman, "Questioning Terror Suspects in a Dark and Surreal World," *The New York Times*, March 9, 2003.

[123] Dana Priest, "CIA Puts Harsh Tactics on Hold," *The Washington Post*, June 27, 2004.

[124] Assistant Attorney General Michael Chertoff, the head of the Justice Department's Criminal Division, argued on June 3, 2004 that if defense counsel were allowed to interrupt the interrogation of bin al-Shibh, "the damage to the United Sates will be immediate and irreparable" ("Terrorist Attack Aftermath: U.S. Appeal in Moussaoui Case Dismissed," *Facts on File World News Digest*, June 26, 2003). The prosecutors said that "allowing Moussaoui access to Ramzi Bin al-Shibh would permit two terrorists to exchange classified information" (Toni Locy, "Ashcroft Defies Moussaoui Case Order," *USA Today*, July 15, 2003).

[125] See Jerry Markon, "Court Clears Way for Moussaoui Trial," *Washington Post*, September 14, 2004.

Mutasaddiq in Hamburg, Germany, accused of complicity in the 9/11 attacks, the defense for months requested bin al-Shibh's testimony. Finally, on August 11, 2004, the U.S. Justice Department provided excerpts from interrogations of bin al-Shibh, according to which Motassadeq was not involved in the plot.[126]

### Intelligence

According to the Commission on Terrorist Attacks, bin al-Shibh sent $14,000 to Moussaoui in August 2001 based on the understanding that Moussaoui was to be "part of the 9/11 plot."[127] According to the *New York Times*,

Mr. bin al-Shibh has …. proven to be cooperative with interrogators, several senior officials said. But they said his cooperation also did not begin immediately. Several senior counterterrorism officials overseas said recently that they understood that both men [bin al-Shibh and Khalid Shaikh Muhammad] possibly had begun to cooperate either after being subjected to coercive interrogations or after being threatened with torture, an accusation adamantly denied by American officials…. Under harsh interrogation methods, both Mr. Muhammad and Mr. bin al-Shibh appear to have been willing to provide elaborate accounts of past events. But they appeared to have been less willing to describe operations that have not yet been carried out, leading some of the intelligence officials to raise questions about the truthfulness of some or all of their statements.[128]

The 9/11 Commission report refers to the intelligence reports of 41 interrogation sessions with bin al-Shibh, dating from July 2002 to July 2004.

## 6. Abd al-Rahim al-Nashiri, a.k.a. Abu Bilal al-Makki, Abdul Rahman Husain al-Nashari, formerly Muhammad Omar al-Harazi (Saudi Arabia or Yemen—Born in Mecca, Saudi Arabia)

Detention "confirmed" by the U.S. government.[129]

---

[126] "Mr. Motassadeq 'was not privy' to the plans of Mohamed Atta or the other hijackers" (Mark Landler, "German 9/11 Retrial Gets Exculpatory Evidence from U.S.," *New York Times*, August 12, 2004).

[127] Eric Lichtblau, "Report Says Arrest Thwarted Use of Substitute 9/11 Pilot," *New York Times*, June 17, 2004.

[128] David Johnston and Don Van Natta, Jr., "Account of Plot Sets off Debate over Credibility," *New York Times*, June 17, 2004.

[129] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

**Background**

Allegedly chief of al-Qaeda operations in the Persian Gulf. Al-Nashiri was one of the "Afghan Arabs" who fought against the Soviet Union in Afghanistan in the 1980s.[130] An explosives expert, he is described by the 9/11 Commission as "the mastermind of the *Cole* bombing and the eventual head of al-Qaeda operations in the Arabian Peninsula," reporting directly to Osama bin Laden.[131] He is also believed to have played a role in a foiled plot in 2002 to bomb U.S. and British warships in the Strait of Gibraltar; the attack on the French oil tanker Limburg in 2002; and the August 1998 bombings of the U.S. embassies in Kenya and Tanzania.[132]

In July 2004, a Yemeni court charged al-Nashiri *in absentia* and five other people with the Cole bombing.[133] Yemeni officials said that Yemen had sought al-Nashiri's extradition, but the Yemeni prosecutor in the case questioned whether that had been done.[134] On September 29, 2004 al-Nashiri was sentenced *in absentia* to death in the case.[135]

**Arrest**

He was reportedly arrested in November 2002 in the United Arab Emirates. While intelligence officials would not say where he was caught,[136] one U.S. official told CNN that he was captured "in the region for which he was responsible." The *Washington Post* reported it was in Kuwait,[137] but according to the BBC the United Arab Emirates authorities had arrested al-Nashiri in October.[138] He was said to have been caught thanks to intelligence provided by Saudi authorities but also thanks to Abu Zubayda's

---

[130] "Al Qaeda Operative Talking," CNN.com, November 23, 2002 [online], http://www.cnn.com/2002/US/11/22/alqaeda.capture/.

[131] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 152.

[132] "Top al Qaeda Operative Arrested," *CNN.com*, November 22, 2002 [online], http://www.cnn.com/2002/US/11/21/alqaeda.capture/.

[133] "Six Charged for USS Cole Bombing." *Aljazeera net*, July 7, 2004 [online], http://english.aljazeera.net/NR/exeres/F39252FA-C82D-4B7B-93B2-4446937E03F1.htm.

[134] Ahmed Al-Haj, "Accused Cole Bombers' Lawyer Disputes Evidence," Associated Press, August 18, 2004.

[135] "USS Cole Bombers Sentenced to Death," *BBC*, September 29, 2004 [online], http://news.bbc.co.uk/2/hi/middle_east/3699426.stm#.

[136] "Al Qaeda Operative Talking," CNN.com, November 23, 2002 [online], http://www.cnn.com/2002/US/11/22/alqaeda.capture/.

[137] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[138] "Militant 'Planned Attacks' in Gulf," BBC News Online, December 23, 2002 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2602627.stm.

intelligence.[139] President Bush hailed his capture, saying, "We did bring to justice a killer."[140]

## Detention

Officials confirmed that al-Nashiri was held briefly in Afghanistan before being transferred to his current location but have not said where he was taken after that.[141] The U.S. initially withheld his name while he was being interrogated, hoping he would lead them to other senior members of al-Qaeda.[142] U.S. officials stated on November 21, 2002, that Al-Nashiri was being interrogated in an undisclosed foreign country.[143] In June 2004, he remained under CIA control.[144]

## Intelligence

Tom Ridge, the U.S. Homeland Security director, confirmed his capture and declared on November 17, 2002, that "the prisoner was providing useful information."[145] Another U.S. official said: "He has been of some help in terms of information." His interrogation may have led the FBI to warn about "possible attacks on U.S. warships, ports, naval bases and cruise ship docks."[146] The 9/11 Commission stated that evidence of Osama bin Laden's involvement in the Cole bombing came from the interrogation of al-Nashiri and Attash.[147] The Commission report refers to the intelligence reports of nine interrogation sessions with Al-Nashiri, dating from November 2002 to February 2004.

---

[139] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[140] "Al Qaeda Operative Talking," CNN.com, November 23, 2002 [online], http://www.cnn.com/2002/US/11/22/alqaeda.capture/.

[141] "'Al-Qaeda Gulf Chief' Held by US," *BBC News Online*, November 22, 2002 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2501121.stm.

[142] "Terrorist Attack Aftermath: Alleged Senior Qaeda Member Said Held," *Facts on File World News Digest*, November 21, 2002.

[143] "'Al-Qaeda Gulf Chief' Held by US," *BBC News Online*, November 22, 2002 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2501121.stm.

[144] Dana Priest, "CIA Puts Harsh Tactics on Hold: Memo on Methods of Interrogation Had Wide Review," *Washington Post*, June 27, 2004.

[145] "'Al-Qaeda Gulf Chief' Held by US," *BBC News Online*, November 22, 2002 [online], http://news.bbc.co.uk/1/hi/world/middle_east/2501121.stm.

[146] "Al Qaeda Operative Talking," CNN.com, November 23, 2002 [online], http://www.cnn.com/2002/US/11/22/alqaeda.capture/.

[147] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 193.

### 7. Mustafa al-Hawsawi (Saudi Arabia)

Detention not "confirmed" by the U.S. government.[148]

**Background**

Al-Hawsawi's name appears frequently on the al-Qaeda money trail being tracked down by authorities, but his multiple aliases and birthdates have complicated investigations. The U.S. indictment charging Zacarias Moussaoui with conspiracy in the 9/11 attacks lists a number of transactions involving al-Hawsawi in the months leading up to the attacks. They include: the opening of a checking account in Dubai at the same branch where hijacker Fayez Ahmed opened a savings account the same day, and subsequent transactions between the two accounts; and receiving a package sent by Muhammad Atta from Florida to Dubai one week before the attacks. On Sept. 11, 2001, just hours before the attacks on the United States, al-Hawsawi emptied Ahmed's Dubai account and deposited more than $22,000 into his own account.[149]

**Arrest**

Al-Hawsawi was arrested by U.S. and Pakistani forces on March 1, 2003 (together with Khalid Shaikh Muhammad) in Rawalpindi, Pakistan.[150]

**Detention**

The FBI declared that Hawsawi (and Khalid Shaikh Muhammad) were transferred to a "secure site outside Pakistan where they are being interrogated."[151] Reports say al-Hawsawi (together with Khalid Shaikh Muhammad and `Abd al-Qadus was taken to U.S. Bagram airbase in Afghanistan. But the U.S. forces spokesman in Afghanistan, Colonel Roger King would not confirm the reports.[152] As with Ramzi bin al-Shibh and Khalid Shaikh Muhammad, the federal appeals court granted Zacarias Moussaoui access

---

[148] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[149] Kevin McCoy, "Court Papers Cite al-Hawsawi in Funding Attacks," *USA Today*, December 18, 2001.

[150] "Bush Hails 'al-Qaeda Killer' Arrest," *BBC News Online*, March 4, 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/2817441.stm; "US Says 9/11 Financier Caught," BBC News Online, March 4, 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/2819317.stm.

[151] "FBI Warns Mohammed Arrest May Speed Attacks," *Fox News*, March 6, 2003.

[152] "Bin Laden 'Not in Pakistan,'" *BBC News Online*, March 5, 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/2821325.stm.

to testimony from al-Hawsawi after a prolonged debate over the implications of such a move for national security.[153]

### Intelligence

According to the *Christian Science Monitor*, intelligence given by Hawsawi led to the capture of Yasser al-Jaziri, another al-Qaeda financier, in March 2003.[154] The seizure of his computer led to "lists of contributors around the globe, including bank account numbers and names of organizations that have helped finance terror operations."[155]

## *8. Khalid Shaikh Muhammad, a.k.a. Shaikh Muhammad, Ashraf Ref`at Nabith Henin, Khalid `Abd al-Wadud, Salem `Ali, Fahd bin Abdullah bin Khalid (Kuwait)*

Detention "confirmed" by the U.S. government.[156]

### Background

Described by the 9/11 Commission as "the model of the terrorist entrepreneur," "KSM" was "the principal architect of the 9/11 attacks."[157] He was also allegedly the mastermind behind the murder of U.S. journalist Daniel Pearl in 2002, USS Cole attack, 1998 attacks on U.S. embassies in Kenya and Tanzania, the attack on a synagogue on the island of Djerba in Morocco in 2002, and virtually every other major al-Qaeda attack. Muhammad is allegedly the third-ranking official of al-Qaeda. He is said to be fluent in Arabic, English, Urdu, and Baluchi. KSM graduated from the North Carolina Agricultural and Technical State University in 1986 before moving to Peshwar, Pakistan, where he became acquainted with bin Laden.[158] KSM helped finance the 1993 World Trade Center bombing, masterminded by his nephew Ramzi Yusif. In 1994 he joined Yusif in the Philippines to plan the blowing up of American airliners flying from Southeast Asia. Yusif and two other conspirators were arrested and brought to the U.S. for trial, but Muhammad eluded capture following his indictment in 1996 for his role in

---

[153] Phil Hirschkorn, "Moussaoui Case May Proceed, Federal Appeals Court Rules," *CNN.com*, April 24, 2004 [online], http://www.cnn.com/2004/LAW/04/22/moussaoui/.

[154] "Terror Funding Hurt by al Qaeda Arrest in Pakistan," *The Christian Science Monitor*, March 17, 2003.

[155] "FBI Warns Mohammed Arrest May Speed Attacks," *Fox News*, March 6, 2003.

[156] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[157] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 145.

[158] "Profile: Al Qaeda 'Kingpin,'" *BBC News Online*, March 5, 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/2811855.stm.

the plot. In early 1999, bin Laden endorsed KSM's plan of using aircraft as weapons and some months later in Kandahar they drew up targets which included the White House and the Pentagon; the Capitol; and the World Trade Center. KSM was subsequently the lead planner of the attacks.[159]

**Arrest**

U.S. and Pakistani officials announced that KSM was arrested on March 1, 2003 in Rawalpindi, Pakistan, though there are rumors that he was in fact arrested earlier. Tom Ridge, the U.S. Homeland Security director, boasted: "We got a big one this past weekend." White House spokesman Ari Fleischer said "Let's just say it's been a good day for all around the world, except for al-Qaeda."

KSM's two sons, Yusif al-Khalid (nine years old) and Abed al-Khalid (seven) were reportedly picked up in September 2002 by Pakistani security forces during an attempted capture of KSM. They were reportedly held in an undisclosed place until KSM's arrest in March 2003 when they were reportedly transferred to custody in the United States, allegedly in order to force their father to talk. However U.S. authorities have denied that the two children were in the custody of U.S. officials, either in the U.S. or anywhere else, or that the boys had been interrogated by U.S. officials.[160]

**Detention**

KSM was reportedly questioned initially by Pakistan's Inter-Services Intelligence (ISI) before being turned over to the United States at Chaklala Air Force base in Rawalpindi. There, he was reportedly flown to the CIA interrogation center in Bagram, Afghanistan, and from there, some days later, to an "undisclosed location."[161] On September 30, 2004, in the first Presidential debate, President Bush said that KSM was "in prison." There have been persistent allegations that Khalid Shaikh Muhammad has been tortured in detention. According to the *New York Times*, "C.I.A. interrogators used graduated levels of force, including a technique known as 'water boarding,' in which a prisoner is strapped down, forcibly pushed under water and made to believe he might drown."[162] The same account added "The methods employed by the C.I.A. are so severe that senior

[159] The above information, including the background on Muhammad, comes largely from the Staff Statements of the 9/11 Commission.

[160] See Olga Craig, "CIA holds young sons of captured al-Qaeda chief," *The Sunday Telegraph*, March 9, 2003; Jess Bravin and Gary Fields, "How Do U.S. Interrogators Make a Captured Terrorist Talk?" *The Wall Street Journal*, March 4, 2003; Amnesty International, "Pakistan: Open Letter to President Pervez Musharraf," AI Index ASA 33/003/2004, February 3, 2004

[161] Mark Bowden, "The Dark Art of Interrogation," *The Atlantic Monthly*, October 2003.

[162] James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004.

officials of the Federal Bureau of Investigation have directed its agents to stay out of many of the interviews of the high-level detainees, counterterrorism officials said. The F.B.I. officials have advised the bureau's director, Robert S. Mueller III, that the interrogation techniques, which would be prohibited in criminal cases, could compromise their agents in future criminal cases, the counterterrorism officials said."

### Intelligence

Khalid Shaikh Muhammad has reportedly provided a wealth of information, though there are conflicting reports as to whether he began to provide it immediately or not.[163] In late March 2003, *Time* reported that KSM had "given U.S. interrogators the names and descriptions of about a dozen key al-Qaeda operatives believed to be plotting terrorist attacks on America and other western countries, according to federal officials" and had "added crucial details to the descriptions of other suspects and filled in important gaps in what U.S. intelligence knows about al-Qaeda's practices."[164] An analysis of the dates of the intelligence reports of seventy-six interrogation sessions with KSM cited by the 9/11 Commission, however, suggests that most of the information provided by KSM on the 9/11 plot, at least, came only a year after his capture.[165] Much of the report of the 9/11 Commission concerning that plot is based on information provided by Khalid Shaikh Muhammad. The BBC cited intelligence sources as saying that Hambali (see below) was captured based on information revealed by Khalid Shaikh Muhammad.[166] "He's singing like a bird," a senior European counterterrorism official told the *New York Times* in June 2004.[167] Extracts of Khalid Shaikh Muhammad's interrogation reports were, after initially being refused, provided in Mounir Motassadeq's trial in Hamburg, Germany.[168]

---

[163] Compare Ronald Kessler, "The CIA at War," St. Martin's Griffin (2003), p. 278 (Khalid Shaikh Muhammad "began cooperating three days after his capture") with "Saying His Prayers: Suspected al Qaeda Mastermind Keeping Quiet on Terror Plans," *ABC News*, March 3, 2003 [online], http://www.abcnews.go.com/sections/world/2020/mohammed030303.html.

[164] Elaine Shannon and Michael Weisskopf, "Khalid Sheikh Mohammed Names Names," *Time.com*, March 24, 2003 [online], http://www.time.com/time/nation/article/0,8599,436061,00.html.

[165] The first interrogation report referred to is dated March 12, 2002, followed by August 13, 2002, October 31, 2002, March 24, 2003, and March 27, 2003. Thereafter, the frequency of the reports cited picks up, with two in April 2003, six in March, six in June, twelve in July, five in August, six in September, four in October, six in November, five in January 2004, seven in February, two in March, six in April, two in May, and two in July.

[166] "Terror Suspect Hambali Quizzed," *BBC News Online*, August 15, 2003 [online]. http://news.bbc.co.uk/1/hi/world/asia-pacific/3152755.stm.

[167] David Johnston and Don Van Natta, Jr., "Account of Plot Sets off Debate over Credibility," *New York Times*, June 17, 2004.

[168] The evidence apparently benefited Motassadeq. KSM reportedly "never discussed the plot with [Motassadeq], although he helped Mr. Motassadeq arrange a trip to Afghanistan, where he spent time in a training camp sponsored by Osama bin Laden" (Mark Landler, "German 9/11 Retrial Gets Exculpatory Evidence from U.S.," *New York Times*, August 12, 2004).

### 9. *Waleed Muhammad bin Attash, a.k.a. Tawfiq ibn Attash, Tawfiq Attash Khallad (Yemen)*

Detention "confirmed" by the U.S. government.[169]

**Background**

Alleged top al-Qaeda operational commander suspected of playing crucial roles in both the bombing of the USS Cole in 2000 and the Sept. 11 terror attacks. Attash lost his lower right leg in battle in Afghanistan and, according to his interrogation by U.S. officials, later volunteered to become a suicide operative.[170] He was arrested in Yemen in 1999, but was apparently released after Osama bin Laden's intervention.[171] According to the interrogations of Khalid Shaikh Muhammad and Attash made available to the 9/11 Commission, Attash was selected as one of the 9/11 operatives by bin Laden but was unable to obtain a U.S. visa. [172] U.S. officials believe he coordinated, at a meeting in Kuala Lumpur in January 2000, the activities of two hijackers who crashed a plane into the Pentagon on Sept. 11. He also cased flights in South East Asia.[173] Attash was allegedly in Afghanistan for much of the planning of the attacks and was believed to have moved to Pakistan by late 2002, according to U.S. officials.[174]

**Arrest**

Attash was arrested April 29, 2003 along with five other suspected al-Qaeda members in a police raid in Karachi, Pakistan and handed over to the U.S. forces. President Bush hailed his arrest as a "major, significant find" in the war against terrorism. "He's a killer. He was one of the top al-Qaeda operatives...He was right below Khalid Shaikh Muhammad on the organizational chart of al-Qaeda. He is one less person that people who love freedom have to worry about."[175] Police reportedly found 330 pounds of high explosives and a large quantity of guns and ammunition when he was arrested. His arrest

---

[169] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[170] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 155.

[171] Ibid, pp. 155-56. See also "Yemen Denies bin Laden Contact to Free Operative," *Arab News*, July 27, 2004.

[172] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, pp. 155-56.

[173] Ibid., pp. 158-159.

[174] Afzal Nadeem, "Pakistan Arrests Six Terror Suspects, including Planner of Sept. 11 and USS Cole Bombing," Associated Press, April 30, 2003.

[175] David Ensor and Syed Mohsin Naqvi, "Bush Hails Capture of Top al Qaeda Operative," *CNN.com*, May 1, 2003 [online], http://www.cnn.com/2003/WORLD/asiapcf/04/30/pakistan.alqaeda/.

reportedly uncovered a plot to crash a small aircraft carrying explosives into the U.S. consulate in Karachi.[176]

**Detention**

Attash is said to be is in U.S. custody in an undisclosed location.[177]

**Intelligence**

Attash was initially interrogated by Pakistani intelligence officials and was then handed over to the U.S. agents for questioning in the presence of Pakistani officials.[178] According to *Time* magazine, Attash provided U.S. interrogators with information about connections between Iran and al-Qaeda.[179] The 9/11 Commission stated that evidence of bin Laden's personal involvement in the Cole bombing came from the interrogation of al-Nashiri and Attash.[180] Information gleaned from the interrogation of Attash is relied on heavily in the 9/11 report,[181] which refers to the intelligence reports of twenty-seven interrogation sessions with Attash.

## 10. Adil al-Jazeeri (Algeria)

Detention not "confirmed" by the U.S. government.[182]

**Background**

After volunteering in the Afghan war against the Soviet occupation in the 1980s, al-Jazeeri lived in the region for more than fifteen years.[183] Pakistani authorities believe he served as a contact between al-Qaeda and the Taliban and also served as an aide to the

---

[176] "Al-Qaida Killed/Captured," *MSNBC*, [online], www.msnbc.com/modules/wtc/wtc_globaldragnet/custody_alqaida.htm.

[177] "Yemeni Pair Charged in USS Cole Bombing," *CNN.com*, May 15, 2003 [online], http://www.cnn.com/2003/LAW/05/15/cole.bombing.charges/; "The Persuaders," *The Observer*, October 19 2003.

[178] "Azfar-ul-Ashfaque '50 More al-Qaeda Men Hiding in Karachi,'" *The News*, May 2, 2003.

[179] Adam Zagorin and Joe Klein, "9/11 Commission Finds Ties between al-Qaeda and Iran," *Time.com*, [online], http://www.time.com/time/nation/printout/0,8816,664967,00.html.

[180] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 193.

[181] Ibid., pp. 158-159.

[182] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[183] "Pakistan Hands over al-Qaeda Suspect," *BBC News Online*, July 15 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/3067135.stm.

former Afghan foreign minister Wakil Ahmad Mutawakkil in Kabul.[184] He is also believed to have served as a facilitator for al-Qaeda by arranging money transfers, preparing visas, etc.[185]

## Arrest
Arrested on June 17, 2003 in the district of Hayatabad, in Peshawar, Pakistan.

## Detention
Al-Jazeeri was first questioned by the Pakistani police,[186] and possibly subjected to ill-treatment while in incommunicado detention.[187] On July 13, 2003, according to a Pakistani intelligence official, he was flown out of Peshawar on a small plane in the custody of U.S. agents while blindfolded and with his hands bound.[188] The State Department reported in December 2003 that "Adil Al-Jazeeri, a suspected Osama bin Laden aide, was recently arrested by Pakistani authorities and turned over to the U.S."[189] He is believed to have been taken to the U.S. airforce base in Bagram, Afghanistan, for further questioning.[190]

## Intelligence
He was expected to provide information about the al-Qaeda network: "Being a facilitator [al-Jazeeri] is privy to certain activities which normal operatives do not have. He must have a lot of information."[191]

---

[184] Sohail Abdul Nasir, "Al Qaeda, Two Years On," *Bulletin of the Atomic Scientists*, September/October 2003.

[185] "Al-Qa'idah Men Arrested in Pakistan Termed 'Facilitators,'" *BBC Monitoring International Reports*, July 17, 2003.

[186] "'Key' al-Qaeda Suspect Questioned," *BBC News Online*, June 19 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/3003348.stm.

[187] An unidentified Pakistani intelligence official was quoted as saying that the detainee was being subjected to "some tough questioning" ("America: Incommunicado Detention / Fear of Ill-Treatment, Adil al-Jazeeri," Amnesty International *Urgent Action*, July 16, 2003 [online], http://web.amnesty.org/library/index/ENGAMR511032003).

[188] "Alleged Qaeda Big Goes to Bagram," *CBS News*, July 14, 2003.

[189] U.S. Department of State, "FY 2003 Performance and Accountability Report," December 2003 [online], http://www.state.gov/m/rm/rls/perfrpt/2003/html/28996.htm.

[190] "Pakistan Hands over al-Qaeda Suspect," *BBC News Online*, July 15 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/3067135.stm.

[191] Statement of Interior Minister Faisal Saleh Hayat to Agence France-Presse ("'Key' al-Qaeda Suspect Questioned," *BBC News Online*, June 19, 2003 [online], http://news.bbc.co.uk/1/hi/world/south_asia/3003348.stm).

### 11. Hambali, a.k.a. Riduan Isamuddin (Indonesia)

Detention "confirmed" by the U.S. government.[192]

**Background**

Indonesian cleric, a top figure in the coordination between al-Qaeda and Jemaah Islamiyah (JI), a terrorist network in Southeast Asia.[193] The CIA has called him "South East Asia's bin Laden."[194] The al-Qaeda-JI relationship married "al-Qaeda's financial and technical strengths with JI's access to materials and local operatives."[195] Hambali allegedly organized or financed the October 12, 2002 Bali nightclub bombing, the August 5, 2003 Jakarta Marriot Hotel bombing, and bombings in Manila in 2000 that killed 22 people,[196] and he is said to have been involved in preparations for Sept. 11. Hambali was videotaped in a January 2000 meeting with two of the 9/11 hijackers in Malaysia – Khalid al-Mihdhar and Nawaf Al-Hazm.[197] He is said to have been planning to carry out an attack on a meeting of world leaders in Bangkok in October 2003.[198]

**Arrest**

Hambali was captured on August 11, 2003 in Ayutthaya, Thailand, perhaps by a joint U.S.-Thai police operation.[199] (The United States reportedly paid Thailand U.S. $10 million for its part in his capture.)[200] His capture is said to have been organized by the CIA. The BBC cited intelligence sources as saying that he was captured based on

---

[192] As per 9/11 Commission. See National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 488, n. 2.

[193] John Burton, "Rise and Fall of East's 'Osama bin Laden': Profile," *Financial Times*, August 16, 2003; National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 150.

[194] "Hambali: 'Asia's bin Laden,'" *BBC News Online*, August 15, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/2346225.stm

[195] National Commission on Terrorist Attacks upon the United States, *9-11 Commission Report*, Norton, W. W. & Company, Inc., 2004, p. 151.

[196] Richard C. Paddock, "Al Qaeda Funds Used in Philippines: Authorities Allege that the Terrorist Network Gave at Least $25,000 to Finance Bombings by Jemaah Islamiyah," *Los Angeles Times*, May 7, 2004.

[197] Amy Chew, "Hambali Was 'plotting APEC attack,'" *CNN.com*, February 26, 2004 [online], http://www.cnn.com/2003/WORLD/asiapcf/southeast/08/14/hambali.capture/.

[198] "US Pays $10M for Hambali," *BBC News Online*, September 17, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3115196.stm.

[199] "Indonesia to Get Access to Hambali," *BBC News Online*, August, 28 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3187389.stm.

[200] "US Pays $10M for Hambali," *BBC News Online*, September 17, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3115196.stm.

information revealed by Khalid Shaikh Muhammad.[201] After his seizure, President Bush said in a speech to troops "Hambali was one of the world's most lethal terrorists... He is no longer a problem to those of us who love freedom.... He's a known killer."[202] The Australian Prime Minister John Howard said "There should be universal relief and pleasure that a man as evil as Hambali has been caught.... This man is a very big fish."[203]

## Detention

After Hambali's capture in August 2003 in Thailand, he was handed over to the CIA. He has since been held in an undisclosed location by the U.S. Hambali was originally reported to be held on the U.S. military base on Diego Garcia Island, but subsequent assurances from the U.S. government to the British government that no detainees are being held there have since cast doubt on those reports. The United States has not responded to repeated requests from Human Rights Watch for information on Hambali's location, legal status, and conditions of detention.[204] The Indonesian government has become increasingly frustrated with U.S. delays in giving it access to Hambali. During an October 2003 stop in Bali, President Bush promised Indonesian President Megawati that the U.S. would give access to Hambali. But U.S. Attorney General John Ashcroft told Megawati that "no time frame" has been set for Hambali to be questioned by Indonesia.[205] Although the U.S. has given Indonesia interview transcripts, Indonesia has insisted it cannot use such transcripts in court.

## Intelligence

"Hambali is the one man who knows more than any other on the terrorist cells through Indonesia and Southeast Asia," said Indonesia's then senior security minister and now president-elect, Susilo Bambang Yudhoyono.[206] Indonesian authorities were not able to obtain physical access to Hambali, but managed to interview him on the JI network through written questions and answers. The chief of Indonesian intelligence, A.M.

---

[201] "Terror Suspect Hambali Quizzed," *BBC News Online*, August 15, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3152755.stm.

[202] "Key Asian Terror Suspect Seized," *BBC News Online*, August 14, 2003 [online], http://news.bbc.co.uk/1/hi/world/americas/3152263.stm.

[203] "Terror Suspect Hambali Quizzed," *BBC News Online*, August 15, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3152755.stm.

[204] Human Rights Watch, "In the Name of Security: Counterterrorism and Human Rights Abuses under Malaysia's Internal Security Act," May 2004.

[205] Shawn Donnan, "Indonesian Anger Grows over U.S. Delay in Allowing Access to Hambali," *Financial Times*, February 5, 2004.

[206] Marian Wilkinson, "US Denies Indonesia Access to Hambali," *Sydney Morning Herald*, September 22, 2003.

Hendropriyono, said that Hambali's answers provided important information: "From those we have a picture of the size of the network and the targets for their plans."[207]

Thai Prime Minister Thaksin Shinawatra confirmed a report in The *Australian* newspaper that Hambali revealed while under interrogation that he had the Australian and U.S. embassies in his sights.[208]

Khalid Shaikh Muhammad reportedly told U.S. interrogators that he gave the money for JI's Philippine operations to Hambali. Hambali reportedly told interrogators that he had transferred $25,000 in July 2003 to a cell in the southern Philippines that was working with the Moro Islamic Liberation Front, a separatist group with a history of violence.[209] The information provided by the U.S. to Philippine authorities from the interrogations is said to have helped lead to the arrest of several members of a JI cell in the Philippines. [210] The 9/11 Commission report refers to the intelligence reports of nine interrogation sessions with Hambali, dating from January 2003 to March 2004.

---

[207] "Indonesia Questions Hambali," *BBC News Online*, February 25, 2004 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3484796.stm.

[208] "Hambali Eyed Bangkok Embassies," *BBC News Online*, August 22, 2003 [online], http://news.bbc.co.uk/1/hi/world/asia-pacific/3172769.stm.

[209] Richard C. Paddock, "Al Qaeda Funds Used in Philippines," *Los Angeles Times.*

[210] In October 2003, police raided a safe house for the group in Cotabato. Among the items reportedly found in the house were bomb-making materials and manuals in Indonesian describing how to make biological and chemical weapons (Richard C. Paddock, "Al Qaeda Funds Used in Philippines: Authorities Allege that the Terrorist Network Gave at Least $25,000 to Finance Bombings by Jemaah Islamiyah," *Los Angeles Times*, May 7, 2004.).